Docket No. 81343–Agenda 6–March 1997.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MARK BURNIDGE, Appellant.

Opinion filed September 11, 1997.

JUSTICE MILLER delivered the opinion of the court:

After a jury trial in the circuit court of Lake County, the defendant, Mark Burnidge, was convicted of two counts of aggravated criminal sexual abuse. The trial judge sentenced the defendant to 36 months' probation, together with a nine-month term of periodic imprisonment. The judge also ordered the defendant to pay a total of $1,500 in restitution and fines. The appellate court affirmed the defendant's convictions and sentence. 279 Ill. App. 3d 127. We allowed the defendant's petition for leave to appeal (155 Ill. 2d R. 315(a)), and we now affirm the judgment of the appellate court.

Only a brief recitation of the evidence in this case is necessary here. At trial, R.R., who was 15 years old at the time of the offenses, testified that she and a friend, J.P., arrived at St. Matthew's Lutheran Church, located in Lake Zurich, around 7:30 p.m. on April 16, 1994. They were attending a youth function at the church that night, and they came early to prepare for the event. The defendant, who was then 23 years old, and who served as a counselor to the youth group, was already present when the two girls arrived. According to the complaining witness, after she and the defendant had set up a table in the lobby of the building and were returning to the classroom area, she and the defendant stopped in the gymnasium, where the defendant led her to the stage. There, the defendant kissed her and reached under her shirt and bra and touched her breasts. The defendant also placed R.R.'s hand on the front of his pants. R.R. told the defendant to stop, and he complied.

R.R. testified further that, about 5 or 10 minutes after the incident in the gymnasium, while she and the defendant were in the basement of the building looking for a video cassette recorder, the defendant again kissed her on the mouth, reached under her clothing and touched her breasts, and placed her hand on the front of his pants. R.R. asked the defendant to stop; he did initially but resumed a few moments later. R.R. then told the defendant that they had to go, and they left the basement. R.R. rejoined J.P. upstairs and asked her friend to accompany her to the restroom. There, R.R. straightened her bra, which the defendant had unfastened, and told J.P. what had happened. Later that evening, R.R. reported the incidents to Rev. Carlton Payne, the assistant pastor of the church. R.R. testified that, at a subsequent meeting attended by her, her parents, Rev. Payne, and the defendant, the defendant apologized for what he had done. R.R. denied putting her arm around the defendant or resting her head on his shoulder, as the defendant, in his own testimony at trial, said she had done.

Over a defense objection, R.R. also described a similar incident that occurred in August 1993. On that occasion, R.R. had gone to the church to help her mother do some cleaning. The defendant was there, and he invited R.R. to play basketball with him in the gym. After playing a while, the defendant led R.R. to the stage, where he kissed her and placed his hands under her clothing and felt her breasts. R.R. reported this incident to Rev. Payne about a week later but did not tell anyone else about it at the time. After the incidents in April 1994, however, R.R. informed her parents about the earlier occurrence.

J.P. provided testimony corroborating R.R.'s account of their preparations for the church event that night. According to J.P., after R.R. and the defendant had returned from a search for the video cassette recorder, R.R. suggested that the two girls go to the restroom. There, R.R. straightened her bra and tucked in her shirt. R.R. seemed nervous and began to cry. R.R. then told J.P. that the defendant had kissed her and “tried to go up her shirt.”

The defendant also testified at trial, admitting to one instance of physical contact with R.R. The defendant said that he, R.R., and J.P. first set up a table in the lobby of the building. Afterwards, they were searching for a video cassette recorder, and at one point the defendant told the two girls that he would look downstairs for it. The defendant testified that as he was going to the lower level of the building, R.R. appeared behind him and said that she, too, was going to look for the video recorder. According to the defendant, as they were walking together down a hallway in the basement, R.R. put her arm around the defendant's waist and rested her head on his shoulder. The defendant testified that, when they reached the end of the hallway, he kissed R.R. and placed his hand on her breasts, over her clothing. The defendant stated that the incident lasted about 10 seconds, and he explained that he stopped what he was doing because it was not proper. According to the defendant, neither he nor R.R. said anything during this time. The defendant denied having any other physical contact with R.R. on April 16, 1994, and he also denied the August 1993 incident described by her.

At the defendant's request, the trial judge instructed the jury on battery as an included offense of the two charges of aggravated criminal sexual abuse. The jury found the defendant guilty of both counts of aggravated criminal sexual abuse, as well as of battery. The trial judge later vacated the battery conviction because it was included in the principal charges. On the two counts of aggravated criminal sexual abuse, the trial judge sentenced the defendant to 36 months' probation, with a nine-month term of periodic imprisonment, and ordered the defendant to pay a total of $1,500 in fines and in restitution; the restitutionary portion of the order provided reimbursement to the complainant and her family for counseling costs.

The appellate court affirmed the defendant's convictions and sentence. 279 Ill. App. 3d 127. The court rejected, among other contentions, the defendant's “novel argument” that the entire prosecution should have been dismissed because the State's evidence was tainted by a clergyman's improper disclosure of confidential information received from the defendant. 279 Ill. App. 3d at 132. We allowed the defendant's petition for leave to appeal. 155 Ill. 2d R. 315(a).

The only question raised on appeal by the defendant concerns the trial judge's refusal to dismiss the present case because, in the defendant's view, it was tainted by a clergyman's improper disclosure of conversations between the clergyman and the defendant. This issue was raised prior to trial, when the defendant asked the trial judge to suppress all evidence derived from conversations between the defendant and Rev. John Golisch, and reported by Rev. Golisch to the Department of Children and Family Services (DCFS). Rev. Golisch was a pastor at another Lutheran church and a psychologist, and Rev. Payne had referred the defendant to him for counseling. After speaking with the defendant, Rev. Golisch was not sure whether he was required to file a report with DCFS pursuant to section 4 of the Abused and Neglected Child Reporting Act (325 ILCS 5/4 (West 1994)). Rev. Golisch explained at the pretrial hearing that he called DCFS for advice and was told that as a clergyman he was not required to submit a report but that as a psychologist he was. The statute requires psychologists, but not members of the clergy, to report instances of abuse. Rev. Golisch subsequently submitted to DCFS a report that identified R.R. as a victim of abuse but did not name the offender. Also at the pretrial hearing, the parties stipulated that DCFS relayed Rev. Golisch's report to the Lake County sheriff's office, and that the sheriff's office then brought the matter to the State's Attorney's attention.

The trial judge agreed with the defendant that Rev. Golisch could not be compelled to testify to his conversations with the defendant and that Rev. Golisch's report could not be introduced into evidence. The trial judge refused the defendant's request, however, that he suppress all the other evidence obtained in the wake of the report. Separately, the trial judge determined that conversations between the defendant and Rev. Payne and Deacon Todd Martin were also protected by the clergymen privilege and that those witnesses therefore could not be compelled to testify about what the defendant had said in confidence to them.

The defendant contends that his conversations with Rev. Golisch were privileged and that section 4 of the Abused and Neglected Child Reporting Act did not require the clergyman to submit a report to DCFS. The defendant argues further that the Lake County authorities would not have learned about the present offenses had it not been for the allegedly improper disclosure made by Rev. Golisch, and the defendant believes that all the information traceable to the disclosure must therefore be excluded. In essence, the defendant seeks to have the entire prosecution quashed because it is the “fruit of the poisonous tree,” having been derived, in the defendant's view, solely from Rev. Golisch's report. Accordingly, the defendant asks that his convictions be reversed outright, without a remand for retrial. In response, the State contends that the defendant's conversations with Rev. Golisch were not privileged, that Rev. Golisch was required to report the instances of abuse to DCFS, and that the defendant waived any privilege he might have possessed. Finally, the State argues that suppression of all the evidence is not an appropriate remedy in this case. We agree with the State that suppression is not required here, and we do not address the State's alternative arguments.

Just as the defendant seeks application of the exclusionary rule to what he characterizes as the fruit of a poisonous tree, so, too, do we believe that exceptions to the poisonous tree doctrine  could be invoked if the exclusionary rule were to apply. Assuming, without deciding, that suppression might be necessary in appropriate cases involving violations of evidentiary privileges (see 
Walstad v. State
, 818 P.2d 695, 699 & n.6 (Alaska App. 1991)), we do not believe that so drastic a remedy would be warranted here. It should be noted that information regarding the defendant's involvement in the present offenses was not secret, even if it is assumed both that the defendant's conversations with Rev. Golisch were privileged and that Rev. Golisch was not required to file a report with DCFS. The complaining witness' own testimony implicated the defendant in these offenses, and the defendant, through an admission made to the victim and her family, had himself acknowledged responsibility for what he had done. In 
Wong Sun v. United States
, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963), the Supreme Court determined that the exclusionary rule is not applicable when the prosecution acquires the evidence in question from a source independent of the alleged illegality. R.R. and her family provided the State with an independent basis for the prosecution. We also note that the report made by Rev. Golisch to DCFS did not identify the defendant by name, referring to him only as a helper to the church youth group to which R.R. belonged. Apparently, it was not until further investigation that the State learned of the defendant's identity.

The defendant maintains, however, that the present case would not have come to the attention of the authorities in Lake County had it not been for Rev. Golisch's report to DCFS, and the defendant therefore insists that the entire prosecution be quashed. As support for this argument, the defendant emphasizes that both Rev. Payne and the complaining witness' family believed, at least initially, that the matter could be resolved entirely within the church, and without the intervention of the civil authorities.

 In 
Nix v. Williams
, 467 U.S. 431, 81 L. Ed. 2d 377, 104 S. Ct. 2501 (1984), the Supreme Court recognized the “inevitable discovery” exception to the rule requiring the exclusion of evidence obtained as a result of a violation of a defendant's constitutional rights. The court in 
Nix
 held that evidence arguably tainted by a prior illegality may be introduced if the prosecution is able to show that “the evidence in question would inevitably have been discovered without reference to the police error or misconduct.” 
Nix
, 467 U.S. at 448, 81 L. Ed. 2d at 390, 104 S. Ct. at 2511. The rationale for the “inevitable discovery” exception is that, while “the prosecution is not to be put in a better position than it would have been in if no illegality had transpired,” the prosecution should not be put “in a 
worse
 position simply because of some earlier police error or misconduct.” (Emphasis in original.) 
Nix
, 467 U.S. at 443, 81 L. Ed. 2d at 387, 104 S. Ct. at 2508.

Although the issue was not phrased in these precise terms at the pretrial hearing on the defendant's motion to suppress, we nonetheless believe that the record belies the defendant's contention that the complaining witness and her parents would not have pursued this matter outside the church. At the pretrial hearing, the complaining witness' father, who was a deacon in the church, acknowledged that he, as well as the others involved in this case, sought initially to resolve this problem internally, without the involvement of civil authorities. The complaining witness' father also said, however, that in his own mind he kept open the possibility that criminal charges could be brought. R.R.'s father explained further that he met with Rev. Harold Krueger and Rev. Payne, the pastor and assistant pastor of the church, on April 19, several days after the incidents charged here. R.R.'s father told the two clergymen that he was very concerned about the matter, that he did not believe that the defendant should be associated with the youth group, and that the defendant, who was a church trustee, should relinquish his set of keys to the church.

R.R.'s father testified further that he next discussed the matter with Rev. Krueger and Rev. Payne several weeks later; also attending that meeting were the complaining witness' mother and the parents of the J.P., who testified at trial. R.R.'s father was angry that more had not been done about the situation, and he continued to insist that the defendant should surrender his keys to the building and adopt a lower profile in church activities.

The victim impact statement submitted by the complaining witness' parents, and introduced into evidence as an attachment to the presentence report, also shows the family's growing sense of displeasure with their church's response to the accusations against the defendant. In a joint statement, the complaining witness' mother and father said that although they had initially believed that the matter could be resolved within the confines of their church, they later became dissatisfied with what the parents believed were insufficient measures taken by the church leaders in response to the defendant's misconduct. The statement explained, “First, it was the defense attorney's position that this incident should have never gotten to court; that it should have been handled in the church. It was our INITIAL intent that this matter be handled by the church, but in our opinion, it was not handled, it was ignored!” (Emphasis in original.) The parents expressed their surprise at what they perceived to be the church's reluctance to make any response to the charges, and noted that the defendant was allowed to participate in the church youth group even after R.R. had reported the August 1993 incident to Rev. Payne. The parents' victim impact statement continued, “About the time we realized that we would be leaving the church, Pastor Payne notified us that DCFS would be contacting us. At this point, we decided to cooperate fully with the Lake County Sheriff's Department and DCFS. We have no regrets about what has happened. We never had to make the decision to call the police, but we never ruled it out either.” The family eventually decided to leave this church and to join another one in a different town.

The complaining witness, in her own victim impact statement, also expressed the view that the church had not handled the situation properly. R.R. explained that the family initially believed that the matter could be resolved within the church but later welcomed the intervention of the civil authorities. In her own statement, which she read at the sentencing hearing, R.R. said, “At first we weren't happy that officials were getting involved. Now we are happy they came to help us.” The testimony and victim impact statements submitted by R.R. and her parents demonstrate to us that the information the defendant seeks to suppress would have come to light even without the involvement of DCFS.

In sum, we do not agree with the defendant that the exclusionary rule requires suppression of all the evidence in this case. By requesting that the entire prosecution be dismissed, the defendant is seeking a remedy that is much more extensive in scope than the evil he complains of. In the circumstances presented here, the trial judge granted the defendant the full measure of relief that was necessary to vindicate the privilege the defendant asserts. Following a pretrial hearing, the judge barred the introduction of the report made by Rev. Golisch to DCFS, as well as testimony by the clergymen to whom the defendant had spoken about the matter–Rev. Golisch, Rev. Payne, and Deacon Martin. By excluding this evidence, the trial judge provided the defendant with an appropriate remedy for the alleged breach of the privilege. See 
People v. Knippenberg
, 66 Ill. 2d 276 (1977).

The special concurrence presupposes that we have determined that the exclusionary rule is available in these circumstances, but in this case we have only assumed its application. Because the defendant raises no further challenge to the proceedings below, we therefore affirm his convictions and sentence. For the reasons stated, the judgment of the appellate court is affirmed.

Judgment affirmed.

CHIEF JUSTICE FREEMAN, specially concurring:

Defendant in this case has framed the issue on appeal as one requiring an analysis which is ordinarily reserved for those cases challenging the admissibility of evidence as being the “fruit of the poisonous tree.” The majority has inclined its ear and, correspondingly, engages in an analysis to determine whether, regardless of Rev. Golisch's violation of the clergy testimonial privilege, the challenged evidence would have been inevitably discovered and, therefore, properly admissible. Slip op. at 5. I agree with the majority's ultimate conclusion that the trial court provided defendant with the appropriate remedy for an alleged breach of the clergy privilege. Slip op. at 8. I disagree, however, with the majority's decision to apply the “fruit of the poisonous tree doctrine” and its correlative inevitable discovery exception in disposing of this case. I therefore write separately to address this point.

The “fruit of the poisonous tree” doctrine was born out of fourth amendment concerns over improper police conduct in the gathering of evidence. See 
Nix v. Williams
, 467 U.S. 431, 442, 81 L. Ed. 2d 377, 386, 104 S. Ct. 2501, 2508 (1984). Generally, evidence obtained through the exploitation of illegal police conduct must be excluded from evidence at trial. See Note, 
The Inevitable Discovery Exception To The
 Constitutional Exclusionary Rules
, 74 Colum. L. Rev. 88 (1974). This exclusionary rule deprives the prosecution of evidence tainted by official wrongdoing and thereby discourages future improprieties. See 
United States v.
 Jones
, 72 F.3d 1324, 1330 (7th Cir. 1995).

An exception to the exclusionary rule is the “inevitable discovery doctrine.” 
People v. Edwards
, 144 Ill. 2d 108, 143 (1991); 
Nix v.
 
Williams
, 467 U.S. 431, 81 L. Ed. 2d 377, 104 S. Ct. 2501 (1984). The exception serves to block the setting aside of convictions that would have been obtained without police misconduct. 
Nix
, 467 U.S. at 443 n.4, 81 L. Ed. 2d at 387 n.4, 104 S. Ct. at 2509 n.4. If the prosecution can establish by a preponderance of the evidence that the information inevitably would have been discovered by lawful means, then the evidence should be received. 
Nix
, 467 U.S. at 444, 81 L. Ed. 2d at 387-88, 104 S. Ct. at 2509.

The majority, without supporting authority, extends the reach of the fruit of the poisonous tree doctrine to now cover more than police misconduct cases, but also violations of the clergy privilege by clergymen. Application of the doctrine in these cases is simply inappropriate. See 
People v. Ward
, 199 A.D.2d 573, 604 N.Y.S.2d 320 (1993) (fruit of poisonous tree doctrine not applied to suppress evidence flowing from privileged communication between clergy and penitent); see also 
Walstad v. State
, 818 P.2d 695, 699 n.6 (Alaska App. 1991) (noting that there seems to be considerable doubt as to the extent to which the fruits of the poisonous tree doctrine should apply in cases involving violations of evidentiary privileges). The availability of the doctrine in an evidentiary privilege case, such as this one, could have undesirable consequences. Specifically, in the event that the inevitable discovery exception does not operate to purge the taint of evidence obtained as a result of a violation of the clergyman's privilege, the availability of the exclusionary rule will operate to exclude probative evidence from admission at trial. Moreover, application of the rule in other than illegal police conduct cases is wholly inconsistent with the purpose of the exception–deterring police misconduct.

Even assuming that application of the fruit of the poisonous tree doctrine is proper in evidentiary privilege cases, I disagree that the inevitable discovery exception would operate to “purge the taint” of the challenged evidence here. The majority believes otherwise, finding that because R.R.'s parents had not ruled out the possibility of pursuing criminal charges, evidence concerning the criminal sexual abuse would have been inevitably discovered regardless of Rev. Golisch's report to DCFS. See slip op. at 6-7. This analysis is plagued with infirmities. First, because the State has not engaged in any illegal conduct in acquiring Rev. Golisch's statements, it bears no burden of proof on the issue of inevitable discovery. That, of course, leaves the court to inappropriately make this factual determination. See 
Jones
, 72 F.3d at 1334 (stating that typically a preponderance of the evidence burden of proof for purposes of inevitable discovery requires testimony rather than mere argument).

Second, courts will generally find that evidence would have been inevitably discovered where such evidence would have been, 
inter
 
alia
, discovered through an independent line of investigation untainted by the illegal conduct and the independent investigation was already in progress at the time the evidence was unconstitutionally obtained. 
People v. Durgan
, 281 Ill. App. 3d 863, 867 (1996), citing 
People v. Perez
, 258 Ill. App. 3d 133, 138 (1994); see also 
Nix
, 467 U.S. at 459, 81 L. Ed. 2d at 397, 104 S. Ct. at 2517 (Brennan, J., dissenting, joined by Marshall, J.). In this case, there was no independent police investigation in progress. The investigation did not begin until after Rev. Golisch made his report to DCFS.

Third, the finding of inevitable discovery requires proof by a preponderance of the evidence that the challenged evidence would have been discovered despite the illegal conduct. It is important that courts be extremely careful not to apply the “ `inevitable discovery' rule upon the basis of nothing more than a hunch or speculation as to what otherwise might have occurred.” See 1 W. LaFave, Criminal Procedure §9.3, at 741 (1984). Speculation and assumption do not satisfy the dictates of 
Nix
. See 
Jones
, 72 F.3d 1324 (holding that for inevitable discovery exception to apply, government must establish by preponderance of evidence not only that there would have been probable cause for a lawful search, but that the search in fact would have occurred).

As the majority itself notes, R.R.'s parents had originally intended for this matter to be “handled in the church.” Slip op. at 7. Although the parents had thoughts of filing a complaint with the police, there is no evidence that the parents would have, in fact, contacted the police. Further, it is insufficient for purposes of inevitable discovery that the police might or could have obtained R.R.'s parents' statement. Clearly, to conclude that R.R.'s parents would have made a police report is speculative. Thus, the majority's reliance on the above facts to support inevitable discovery falls far short of the preponderance of the evidence burden of proof mandated by the Court in 
Nix
.

There is one final factor which points up the inappropriateness of the use of the inevitable discovery exception in this case. As I have stated, the inevitable discovery exception flows out of fourth amendment concerns for overreaching by police. In the typical case, the focus of the inquiry is on the future intended investigatory conduct of the violator–the police.

 For its finding of inevitable discovery, the majority here focuses its inquiry, not on the future intended conduct of the person having allegedly violated the privilege, Rev. Golisch, but instead, on the witnesses to the offense. Consistent with the inevitable discovery analysis, the focus of the inquiry here should necessarily be on the intended future conduct of Rev. Golisch in his investigation of the offense. Because Rev. Golisch was, of course, not engaged in an investigation, consideration of his future conduct would leave the inevitable discovery inquiry yet unanswered.

The exclusionary rule, out of which was created the inevitable discovery exception, is the constitutional response to illegally seized evidence. The rule serves the legitimate purpose of deterring police misconduct, while its exceptions operate to defeat the rule's absolute bar to the admissibility of illegally seized evidence. The clergy testimonial privilege, which is statutorily created, also protects legitimate competing interests. However, privileges should be allowed only to the extent necessary to achieve their desired purposes. See J. Hilliard, 
The Public's Right to Evidence–
Sometimes: The Clergy Testimonial Privilege
, 83 Ill. B.J. 182, 182-83 (1995). To apply fourth amendment principles to a statutorily created privilege inappropriately elevates the privilege to constitutional dimensions. See 
Walstad
, 818 P.2d at 699 n.6 (stating that if government was party to improper breach and a constitutional privilege was involved the legal fruits doctrine will apply). Incidentally, it is generally accepted that the clergy privilege is not required by the first amendment. See 83 Ill. B.J. at 183. The clergy privilege, not being of constitutional dimension, merits for its violation no constitutional remedy.

In my view, the appellate court's analysis of the issue presented in this appeal is the proper one. Rather than suggest that fourth amendment principles are even appropriate in cases involving evidentiary privileges, I would simply have affirmed the appellate court.

JUSTICE BILANDIC joins in this special concurrence.