UNITED STATES, Appellee

v.

Mark K. HOLLIS, Journalist First Class
U.S. Navy, Appellant

No. 01-0337

Crim. App. No. 99-0297

United States Court of Appeals for the Armed Forces

Argued December 12, 2001

Decided July 23, 2002

GIERKE, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., and BAKER, J., joined. EFFRON, J., and SULLIVAN,
S.J., each filed an opinion concurring in part and in the result.

Counsel

For Appellant: Lieutenant I. L. Paredes, JAGC, USNR (argued and
    on brief); Captain Curtis M. Allen, USMC.

For Appellee: Lieutenant Christopher J. Gramiccioni, JAGC, USNR
    (argued and on brief); Lieutenant William C. Minick, JAGC,
    USNR.

Military Judge: Gerald T. Hatch

**This opinion is subject to editorial correction before final publication.**

Judge GIERKE delivered the opinion of the Court.

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of rape, forcible sodomy, and indecent acts, in violation of Articles 120, 125, and 134, Uniform Code of Military Justice, 10 USC §§ 920, 925, and 934, respectively.  The victim of the offenses was appellant's five-year-old daughter, J.H.  The adjudged and approved sentence provides for a dishonorable discharge, confinement for 22 years, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence. 54 MJ 809 (2002).

Before this Court, appellant has raised three issues arising from the admission, over defense objection, of the testimony of two Navy medical officers, Lieutenant (LT) Stephen Novek and Captain (CAPT) Barbara Craig, relating statements made by J.H. and her three-year-old sister, R.H.[1]  For the reasons set out below, we affirm.

---

[1]The granted issues are:

> I.  WHETHER THE LOWER COURT ERRED WHEN IT AFFIRMED THE MILITARY JUDGE'S DECISION TO ALLOW LT NOVEK AND CAPT CRAIG TO PRESENT, OVER DEFENSE OBJECTION, THE INADMISSIBLE HEARSAY STATEMENTS OF J.H. AND R.H. TO THE COURT-MARTIAL.
>
> II.  WHETHER THE HEARSAY TESTIMONY BY LT NOVEK AND CAPT CRAIG IS INADMISSIBLE BECAUSE THE PRIMARY PURPOSE OF THEIR INTERVIEWS WAS TO COLLECT INCRIMINATING EVIDENCE AGAINST APPELLANT.
>
> III.  WHETHER APPELLANT WAS DENIED HIS RIGHTS TO CONFRONTATION AND DUE PROCESS BY THE ADMISSION OF HEARSAY STATEMENTS UNDER AN EXTENSIVELY BROADENED FORM OF THE MEDICAL TREATMENT HEARSAY EXCEPTION, WHICH IS NOT A FIRMLY ROOTED HEARSAY EXCEPTION.

The Evidence

In December 1995, appellant reported for duty at the U.S. Naval Support Activity in Naples, Italy.  His estranged wife and two daughters remained in Arizona until April 1996, when the two daughters were escorted to Italy by Ms. Kathy Robie, who stayed in Italy as their live-in nanny.

On August 11, 1997, Ms. Robie had a conversation with J.H. that caused her to believe appellant had sexually abused her. Ms. Robie contacted the Family Services Center and told Ms. Lyn Flahardy about her conversation with J.H.  Ms. Flahardy contacted LT Novek, a staff pediatrician who had previously treated J.H. as a patient.  Ms. Flahardy told LT Novek that J.H. "had disclosed alleged sexual abuse" and asked him to see her.  When Ms. Flahardy said that the most recent sexual abuse was "last night," LT Novek responded that it was a "medical emergency" and arranged to see J.H. later in the day "for a medical evaluation for alleged child sexual abuse."  Ms. Flahardy and two agents from the Naval Criminal Investigative Service (NCIS) escorted Ms. Robie, J.H., and R.H. to the U.S. Naval Hospital, Naples, where J.H. was examined by LT Novek.

Ms. Flahardy, NCIS Special Agent (SA) Kevin Hutson, and Hospitalman Third Class Laura Rodriguez-Calderon were present during LT Novek's meeting with J.H.  SA Hutson testified that LT Novek told him "he would be conducting a physical examination of the girl, . . . and desired to interview her."

LT Novek began by talking to J.H. about the importance of telling the truth, in order "[t]o help her to understand that it was important that she explain things clearly and tell us the

3

truth about what had gone on."  LT Novek testified that J.H. knew who he was because he had previously treated her. Notwithstanding their previous contact, LT Novek told J.H. that he was a doctor and that he "was going to try to help her to figure out what had happened and to help her if she needed help." LT Novek testified that he knew J.H. understood he was trying to make her better, because "she was nodding and she recognized [him] from prior visits."

LT Novek then took a medical history, which he defined as "a series of questions that the physician asks of the patient to try to understand what is wrong with the patient and how to help the patient and how to treat the patient."  During the medical history, J.H. told LT Novek that appellant had been touching her "private parts" and that it "hurt a lot."  She also told LT Novek that appellant "used his hand to put medicine on in front and that he used his private part to touch her from behind and she pointed to her anus."

Toward the end of LT Novek's medical history interview, after J.H. had disclosed appellant's abuse, he invited the other persons present to ask questions.  SA Hutson asked J.H. if appellant "said this was a secret."  She responded, "He said not to tell anybody, because he would go to jail."  SA Hutson also had J.H. identify the partially used tube of Westcort cream prescribed to R.H. but used on J.H. by appellant.  LT Novek testified that he asked all other questions.

After completing the medical history, LT Novek performed a complete physical examination of J.H. that included a detailed genital and anal examination.  He identified vaginal injuries

4

that were consistent with digital or penile penetration.  He characterized his findings as "highly suspicious of abuse but non-confirmatory."  In his written "progress note," LT Novek prescribed a plan that provided for treatment by a clinical psychologist.

In August 1997, appellant's trial defense counsel asked CAPT Barbara Craig, an experienced pediatrician at the National Naval Medical Center in Bethesda, Maryland, to evaluate J.H. and R.H., who were then six years old and four years old, respectively. CAPT Craig contacted the girls' grandparents and arranged a medical evaluation on September 4, 1997.

When CAPT Craig contacted the grandparents, she told the grandfather that "he needed to prepare the children for coming in by telling them they were coming to see a physician, a pediatrician, that [she] was a doctor, that [she] help[s] kids, and that it's always important to tell the truth to the doctor when children come in for a checkup."  When CAPT Craig first met J.H. and R.H. at the hospital, she explained that she was a "kids' doctor," that she "help[s] kids," that she would be asking a lot of questions, and that she wanted them to answer "as best they could."  She was wearing a white coat and had a stethoscope around her neck.  J.H. addressed CAPT Craig as "doctor."

Trial defense counsel had asked CAPT Craig to inquire about the possibility that J.H. had been abused by the son of her mother's boyfriend while she was living in Arizona with her mother.  CAPT Craig testified that J.H. said the boy had done something bad or wrong to her and that she did not want to talk about it.  When CAPT Craig began to ask questions about what

happened in Italy, J.H. began shouting "no, no," and asked her to stop asking questions about it.  J.H. told CAPT Craig that "something bad had happened with her dad," that "it happened in the bedroom in Italy, that it happened at nighttime, that it happened in the bed that she slept in with her father and her sister, [R.H.]."  J.H. said that "her father told her not to tell about what was happening between her father and herself in Italy because he would go to jail."  At this point, J.H. was "heaving, crying, yelling the answers."  She was saying, "I just wanted it to stop, no, no."  She was "yelling the answers . . . , with her head in the corner and kind of rocking back and forth."  CAPT Craig terminated the interview without completing the medical history, because of J.H.'s emotional state.

CAPT Craig was able to conduct a physical examination of J.H. on September 4.  She found vaginal injuries consistent with penile or digital penetration.  CAPT Craig also examined R.H. on September 4.  She explained that she examined R.H. "because frequently children that are in the same home and in the same surroundings or conditions of the child who has been physically or sexually abused might suffer a physical or emotional trauma either by having the abuse occur to them or they can be equally traumatized by witnessing the abuse happen to someone else."

R.H. was four years and ten months old at the time of the examination.  CAPT Craig explained to R.H. that she was a pediatrician, "and that's a doctor who takes care of tummy aches and rashes or whatever."  R.H. interrupted her and blurted out, "I've had medicine for a rash before."  CAPT Craig explained the importance of telling the truth, and R.H. told CAPT Craig that

she understood.  CAPT Craig testified that, in her opinion, R.H. knew she was a doctor and understood the need to tell her the truth.

During the medical history, R.H. told CAPT Craig that while sleeping in the same bed with appellant and J.H., she saw and heard appellant doing "yucky" and "bad" things to J.H.  She saw appellant "opening [J.H.'s] privates with his hands," forcing J.H. to "eat" something in the middle of the night in bed, and kneeling over J.H. as she lay in bed.  R.H. said that she heard J.H. cry and ask appellant why he "does this" to her and not to R.H.

CAPT Craig talked with J.H. again on September 30, this time at J.H.'s request.  J.H. remembered CAPT Craig and greeted her by saying, "Hello, Dr. Craig."  J.H. indicated that she understood this second interview was to enable CAPT Craig to help her. During this interview, J.H. described acts of rape and said that it happened "a zillion times."  She said that appellant kissed her on the mouth.  She described being forced to perform fellatio on appellant, and she described appellant's digital penetration of her anus.

CAPT Craig recommended counseling for both J.H. and R.H. For J.H., she "strongly" recommended counseling consisting of "longer-term therapy."

Over defense objection, the military judge admitted the testimony of LT Novek and CAPT Craig under Mil. R. Evid. 803(4),

Manual for Courts-Martial, United States (2000 ed.).[2]  The

defense objected to LT Novek's testimony as inadmissible hearsay,

on the ground that there was an inadequate showing that J.H.

"understood what benefit she was gonna gain from talking to this

roomful of people."  The defense also objected that LT Novek's

testimony and written report were incomplete because the report

did not include the questions preceding J.H.'s statements and

"some portions of what happened in that interview [were] not

recorded in this history."  With respect to LT Novek's testimony,

the military judge stated:

> I specifically state for the record that the court has
> heard ample evidence that [J.H.] was aware of the
> circumstances for which she was at the doctor's office.
> She recognized the doctor from prior visits for medical
> treatment.  The doctor and his staff advised her that
> she was there for possible medical treatment and to
> determine what was wrong with her so they could get
> treatment, and what had happened so she could be
> treated.  No evidence to the contrary that she didn't
> understand that.  In fact, the doctor indicated that in
> his opinion, she did, and his opinion is obviously
> based on previous exposure to her also.

With respect to R.H.'s statements to CAPT Craig, the

military judge stated:

> I find that [R.H.] understood that she was talking to a
> doctor that helped children.  She understood the need
> to tell the truth and based on Dr. Craig's testimony
> that she understood that it was in her best interest to
> be truthful and that those truthful answers were
> necessary for any type of treatment, whether it was
> physical or counseling.  Even though [R.H.] probably
> didn't know what the word counseling meant, but Dr.
> Craig said talk to for -- to make you better or words
> to that effect.  Therefore, I find that even though it
> is hearsay, it comes within M.R.E. 803(4), as medical
> exception to the hearsay rule.

---

[2] All Manual provisions cited are identical to those in effect at
the time of appellant's court-martial.

Finally, with respect to J.H.'s statements to CAPT Craig, the military judge stated:

> I find based on Dr. Craig's testimony that the statements made by [J.H.] to Dr. Craig on the 30th of September 1997 were for the purpose of promoting her well-being and receiving medical treatment or diagnosis, that [J.H.] knew she was talking to a medical professional. In fact, she greeted her as Dr. Craig, and she understood the need for truthful answers, that they were necessary for her treatment[.]

The prosecution's case-in-chief included the testimony of LT Novek and CAPT Craig relating the statements of J.H. and R.H., and physical evidence of J.H.'s vaginal injuries. It also included appellant's statement to SA Hutson, in which he admitted touching J.H.'s vaginal area and asserted that he was role playing in an effort to determine what had happened between J.H. and her mother's boyfriend's son. Finally, the prosecution case included deoxyribonucleic acid (DNA) evidence identifying 11 semen stains on J.H.'s nightgown as having come from appellant. Neither appellant nor his daughters testified.

## Discussion

Appellant contends that there is no evidence J.H. understood she was being treated for sexual abuse or that she would receive any medical benefit for any ailments when LT Novek and CAPT Craig questioned her. He argues that the purpose of the interviews was to collect incriminating evidence and to smuggle in hearsay testimony using medical professionals acting in complicity with law enforcement officials. He asserts that admitting his daughters' statements under the medical exception violated his right to confront the witnesses. Finally, he asserts that he was

denied due process when the Government, in bad faith, failed to preserve potentially material evidence by failing to videotape or audiotape the interviews of J.H. and R.H.

The Government argues that the military judge's decision to admit the statements of J.H. and R.H. was not an abuse of discretion and that his findings of fact were not clearly erroneous. The Government asserts that the purpose of the interviews was to elicit information for medical diagnosis or treatment, not prosecution. The Government asserts that appellant waived any issue about the availability of J.H. and R.H. by not raising it at trial. It argues that even if the availability issue was not waived, the right of confrontation was satisfied because the medical exception is a firmly rooted exception to the hearsay rule. Finally, the Government argues that there has been no showing of bad faith on the part of LT Novek and CAPT Craig, and that there is no requirement that medical professionals use videotapes or audiotapes during medical examinations.

### Standard of Review

A military judge's decision to admit evidence is reviewed for abuse of discretion. United States v. Sullivan, 42 MJ 360, 363 (1995). We review a military judge's factfinding under the clearly erroneous standard of review, and conclusions of law we review de novo. Id. We will reverse if the findings of fact are clearly erroneous or if the military judge's decision is influenced by an erroneous view of the law. Id.

## Confrontation

The "medical exception" is a firmly rooted exception to the hearsay rule, and, as such, it satisfies the constitutional right of confrontation. White v. Illinois, 502 U.S. 346, 356-57 (1992). Thus, there is no need to establish that the declarant is unavailable as a witness.

## Admissibility under Medical Exception

Under Mil. R. Evid. 803(4), "[s]tatements made for purposes of medical diagnosis or treatment and described medical history" are not excluded by the hearsay rule, even if the declarant is available. The proponent of evidence offered under the medical exception must establish that (1) the statements were made for the purposes of medical diagnosis or treatment, and (2) that the declarant made the statement "with some expectation of receiving medical benefit for the medical diagnosis or treatment that is being sought." United States v. Edens, 31 MJ 267, 269 (CMA 1990) (internal citation omitted). "The key factor in deciding if the second prong is met is 'the state of mind or motive of the patient in giving the information . . . and the expectation or perception of the patient that if he or she gives truthful information, it will help him or her to be healed." United States v. Kelley, 45 MJ 275, 279 (1996) (internal citation omitted). The determination whether the patient has the requisite state of mind is a preliminary question of fact under Mil. R. Evid. 104(a), and, as such, it will be overturned on appeal "only if clearly erroneous." Id. at 280.

A child-victim's expectation of receiving medical treatment need not be established by the child-victim's testimony. It may

be established by the testimony of the treating medical professionals.  See United States v. Quigley, 40 MJ 64, 66 (CMA 1994); Edens, supra at 268.  Although a medical doctor's determination that the child understood the need to be truthful can be an important component of the military judge's inquiry, the record must support the military judge's determination that the child had the requisite understanding and expectation of a medical benefit to satisfy the subjective prong, even if the military judge relies on the doctor's testimony to establish the factual predicate for this determination.  See United States v. Williamson, 26 MJ 115, 118 (CMA 1988), quoted in Edens, supra at 269 ("Although there may be some relaxing of the quantum of proof in those situations where a child is being treated, the facts and circumstances must support a finding that both prongs of the test were met.").

We hold that the military judge did not abuse his discretion by permitting LT Novek to testify about J.H.'s responses to his questions during his medical history interview.  J.H. was taken to LT Novek's office at the Naval Hospital shortly after making an emotional disclosure to her nanny.  J.H. had been treated previously by LT Novek and knew that he was a doctor.  She indicated that she understood the need for truthful answers so that LT Novek could determine what had happened, in order to treat her.

Although appellant asserts that LT Novek was acting in complicity with law enforcement personnel and not for medical reasons, the record shows the contrary.  LT Novek told Ms. Flahardy he needed to see J.H. immediately because it was a

medical emergency. When J.H. arrived at his office, LT Novek told SA Hutson that he wanted to interview J.H. The impetus for the interview was LT Novek's concern about a medical emergency, not a request from SA Hutson for investigative assistance.

J.H.'s responses to the two questions asked by SA Hutson were not admissible under the medical exception. See United States v. Armstrong, 36 MJ 311, 313 (CMA 1993) (responses to trial counsel's questions not admissible under Mil. R. Evid. 803(4)). In United States v. Siroky, 44 MJ 394, 400 (1996), this Court recognized the responsibility of a military judge to scrutinize each segment of a statement offered under Mil. R. Evid. 803(4) to ensure that it satisfies both prongs of the test for the medical exception. We are satisfied, however, that the admission of LT Novek's testimony relating J.H.'s responses to SA Hutson's two questions was harmless beyond a reasonable doubt in light of the other evidence of appellant's guilt.

We also hold that the military judge did not abuse his discretion by admitting CAPT Craig's testimony. CAPT Craig examined the children, at defense counsel's request, to determine if they had been physically and emotionally traumatized. The record reflects that J.H. knew CAPT Craig was a medical doctor, that J.H. asked to see CAPT Craig on September 30, that J.H. addressed CAPT Craig as "Doctor Craig," and that J.H. knew CAPT Craig needed truthful answers to help her.

Similarly, R.H. indicated that she knew CAPT Craig was a doctor. R.H. demonstrated that she knew doctors help children, spontaneously announcing that a doctor had treated her skin rash. R.H. told CAPT Craig that she understood the need for truthful

13

answers so that CAPT Craig could "make [her] better or words to that effect." CAPT Craig's professional assessment was that R.H. knew she was a doctor who helped children and that R.H. understood the need to tell the truth.

Based on this record, we hold that the military judge's preliminary findings of fact were not clearly erroneous, and that he made his ruling based on a correct understanding of the law. Accordingly, we hold that, with the exception of LT Novek's testimony relating J.H.'s responses to SA Hutson's two questions, the military judge did not abuse his discretion by permitting LT Novek and CAPT Craig to testify about the victims' statements to them during their interviews. We further hold that the admission of the portion of LT Novek's testimony relating J.H.'s responses to SA Hutson's two questions was harmless beyond a reasonable doubt in light of the other evidence of appellant's guilt.

### Failure to Preserve Evidence

Appellant's assertion that he was denied due process by the failure to audiotape or videotape the interviews of J.H. and R.H. is without merit for several reasons. First, there is no rule requiring that medical interviews be taped. Second, there is no indication in the record that material evidence was lost. To the contrary, the record reflects that the evidence was carefully preserved by the meticulous interview notes and diagnostic reports prepared by the medical professionals involved. Third, there is nothing in the record suggesting bad faith. See Arizona v. Youngblood, 488 U.S. 51, 58 (1988) ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially

14

useful evidence does not constitute a denial of due process of law.").

## Decision

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

EFFRON, Judge (concurring in part and in the result):

I agree with the majority opinion's conclusion that J.H.'s statements to Drs. Novek and Craig were properly admitted under Mil. R. Evid. 803(4). There are sufficient indicia of J.H.'s subjective intent in the record to show that she understood the purpose for speaking with each doctor and, in return, expected to receive a medical benefit as a result of those communications. See __ MJ at (12-14). However, the record is less than clear as to the motivation of her younger sister, R.H., in speaking to Dr. Craig. The record does not demonstrate that R.H. (1) perceived a link or otherwise understood that her statements to Dr. Craig were for the purpose of medical diagnosis or treatment; (2) believed she needed to be helped, even in a general sense; or (3) expected to medically benefit from responding truthfully when speaking with Dr. Craig.

We have held that "[t]he key factor in deciding if the second prong is met is 'the state of mind or motive of the patient in giving the information . . . and the expectation or perception of the patient that if he or she gives truthful information, it will help him or her to be healed." United States v. Kelley, 45 MJ 275, 279 (1996) (citation omitted). This standard applies equally to adults and children. As this

Court made clear in United States v. Williamson, 26 MJ 115 (CMA 1988), "Although there may be some relaxing of the quantum of proof in those situations where a child is being treated, the facts and circumstances must support a finding that both prongs of the test were met."  Id. at 118, quoted in United States v. Edens, 31 MJ 267, 269 (CMA 1990).

In this case, the majority opinion relies entirely on R.H.'s spontaneous statement, "I've had medicine for a rash before," __ MJ at (6), and the military judge's finding, based on Dr. Craig's testimony, that "[e]ven though [R.H.] probably didn't know what the word [']counseling['] meant, . . . Dr. Craig said talk to for – to make you better or words to that effect," to satisfy the test's subjective prong.  R.H.'s spontaneous statement merely establishes that she may have associated doctors with treating physical ailments.  It does not demonstrate that R.H. acted on the belief that disclosing information about appellant's abuse of her sister would enable Dr. Craig "to make [her] better."  Cf. Olesen v. Class, 164 F.3d 1096, 1098 (8th Cir. 1999) (reversing where physician merely explained "what was going to happen" during the physical examination and no evidence was presented to show the child-victim understood revealing her abuser's identity was important to diagnosis and treatment).

2

I agree with the majority that the fact R.H. may not have known what the word "counseling" meant does not, in and of itself, render her statements inadmissible under the medical exception. However, the burden remained on the prosecution to present evidence establishing that R.H. understood she was there to receive counseling services or, at minimum, help in a general sense, although she may not have known "counseling" was the term to describe the treatment. United States v. Avila, 27 MJ 62, 66 (CMA 1988) ("[U]nless it appears that the child knows at least that the person is rendering care and needs the information in order to help, the rationale for the [medical] exception disappears entirely."); Kelley, 45 MJ at 277, 280 (affirming where counselor introduced himself as a "talking doctor" and "the record support[ed] the military judge's preliminary findings of fact that [the six-year-old victim] understood that Mr. Mills was trying to help her deal with unpleasant thoughts and feelings, and that she needed to tell him what she was thinking and feeling."). The prosecution failed to present such evidence in this case.[*]

---

[*] We have upheld admission of a six-year-old's statements to a psychologist upon finding that the second prong was "narrowly" satisfied where the mother testified that she "'encourag[ed]' her 'daughter to speak openly with Ms. Miller [the psychologist] because she was there to help her'; and 'I've always asked [my daughter] to tell the truth.'" United States v. Dean, 31 MJ 196, 200-01 (CMA 1990). There is no evidence in the record to show that R.H.'s grandparents, who had custody of her at the time of her interview with Dr. Craig, explained to R.H. the purpose of her visit with Dr. Craig or the importance of being truthful or that she needed to be truthful so that Dr.

3

Although R.H.'s statements were erroneously admitted, I believe the error was harmless in light of the Government's overwhelming evidence of appellant's guilt. The DNA evidence of appellant's semen stains on his daughter's pajamas and undergarments, the physical evidence of abuse observed by Drs. Novek and Craig, appellant's admission to touching his daughter's vaginal area, and J.H.'s statements admitted through Drs. Novek and Craig establish appellant's guilt beyond a reasonable doubt.

---

Craig could properly treat her. See also United States v. Siroky, 44 MJ 394, 400 (1996) ("[W]e recognize that a small child may not be able to articulate that he or she expects some benefit from treatment. Thus, it is often important for [the child's] caretakers to explain to [the child] the importance of the treatment in terms that are understandable to the child."). As the majority opinion notes, Dr. Craig testified that she asked the grandparents to "prepare" the children for a "checkup" and to tell them to be truthful. However, no evidence was presented to show that the grandparents did in fact prepare R.H. as requested.

<u>United States v. Hollis</u>, No. 01-0337/NA

SULLIVAN, Senior Judge (concurring in part and in the result):

I have continued fear about admission of the testimony of very young children under the medical exception to the hearsay rule under Mil.R.Evid 803(4).  In <u>United States v. Kelley</u>, 45 MJ 275, 282 (1996), I stated in a separate opinion:

> Moreover, let me express my growing uneasiness with the continuous expansion of and reliance upon the medical exception to the hearsay rule. Mil.R.Evid. 803(4).  Here, a 6-year-old child's statements to a family counselor are taken as proof of a crime under Fed. and Mil.R.Evid. 803(4).  Every day in America, countless statements are given in emergency rooms and medical offices by children, young adults, middle-aged, and elderly patients to doctors of medicine and their assistants.  Are all these statements true?  Are all these statements admissible in court as the sole proof of a crime?  I and my fellow judges should wonder about this and perhaps tighten application of this rule. I suspect that many statements given under the current breadth of the medical-exception umbrella, if closely scrutinized, may not be the complete truth.  Motives should be thoroughly examined at the trial level before such statements are allowed as evidence in court.

On this basis, with regard to the statements of the three-year-old sister, R.H., I adopt the excellent opinion of my brother judge, Judge Effron.  Nevertheless, like my brother, I come to the conclusion that the erroneous admission of R.H.'s

testimony was harmless in light of the overwhelming evidence of appellant's guilt.