CRAWFORD, Chief Judge
(dissenting):
Because the majority misreads the facts of this case, rejects the military judge’s special findings of fact without declaring them clearly erroneous, and misapplies the law relating to the voluntariness of confessions, as well as to the application of the exclusionary rule to evidentiary privileges,[1]1 respectfully dissent.
First, the facts ineluctably lead me to but one conclusion—the impetus for appellant’s confessions was his wife, not misstatements by Chaplain S. Both appellant at trial and the Army Court of Criminal Appeals agree with me. United States v. Benner, 55 MJ 621, 623-24 (Army Ct.Crim.App.2001).
Second, the Fifth Amendment provides that “[n]o person ... shall be compelled in any criminal case to be a witness against himself nor be deprived of life, liberty, or property, without due process of law____” U.S. Const, amend. V. Additionally, Article 31(d), Uniform Code of Military Justice, 10 USC § 831(d), prohibits the admission of any statement into evidence that is “obtained ... through the use of coercion, unlawful influence, or unlawful inducement____” Both require the accused’s confession to be voluntary in order to be admissible into evidence. Dickerson v. United States, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); see also United States v. Raymond, 38 MJ 136 (CMA 1993)(discussing the history of Article 31).
The issue in this case is whether appellant’s confession was voluntary. The waiver of one’s right against self-incrimination set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Article 31 must be the “product of a free and deliberate choice rather than intimidation, coercion, or deception.” Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); see United States v. Harvey, 37 MJ 140 (CMA 1993); Mil.R.Evid. 304(c)(3), Manual for Courts-Martial, United States (2000 ed.). Voluntariness is measured in a number of ways. In the final analysis, it is the “totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation”— that answers the question of voluntariness. Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).
Finally, neither state nor federal courts have applied the exclusionary rule to evidentiary privileges, let alone to evidence derived from evidentiary privileges.[2] “Whatever [the] origins [of the evidentiary privileges], these exceptions to the demand for every man’s evidence are not lightly created nor expansively construed, for they are in derogation of the search for the truth.” United *215 States v. Nixon, 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Disclosure of evidence, rather than the suppression of evidence, promotes truthfinding, and the evidentiary privileges should be strictly confined and not expansively interpreted.
FACTS
Several facts were not contested at trial:
(1) Appellant’s date of birth is June 20, 1973, and he has a GT score of 105.
(2) Ms. Benner, her daughter (the victim) from a previous relationship, and son from her marriage to appellant arrived in Babenhausen, Germany, in March 1998.
(3) Ms. Benner was hospitalized in May 1998. It was during this hospitalization that appellant committed sodomy and committed indecent acts on the child.
(4) Appellant admitted coming forward after discussing with his wife what he did to his stepdaughter and realizing that he needed help. His wife was thinking about leaving him and returning to the United States. Ms. Benner and her children subsequently left Germany.
(5) Appellant’s wife did not report him “because she wanted to see whether [appellant] would take responsibility for his actions and report [the incident] himself.”
The judge made various findings of fact, which we are bound to accept unless clearly erroneous. See, e.g., United States v. Hollis, 57 MJ 74, 79 (2002). They are:
(1) Appellant met with Chaplain S in June 1998 concerning assistance in getting a compassionate reassignment to the Fort Sill area (the location to which Ms. Benner had returned). Military Judge’s Findings, App. Ex. X, ¶ e.
(2) The next time appellant met with Chaplain S was Sunday, September 20, 1998. At this session, he was sobbing and “told Chaplain [S] that he had had an improper relationship with his stepdaughter.” No details of this improper relationship were revealed. Chaplain S informed appellant that he would probably have to report this possible child sexual abuse to military authorities, but would need to confirm his reporting responsibilities the following day. Id. at Hh.
(3) On Monday, September 21, Chaplain S called Family Advocacy personnel, who advised him that he was required to report child sexual abuse. Chaplain S then informed appellant that he would have to report him, but that he “hoped [appellant] would take the responsibility for his actions and report himself.” Thereafter, appellant and Chaplain S engaged in a detailed discussion concerning the acts appellant committed with his stepdaughter. Id. at ¶ i.
(4) During this session, lasting approximately 20-30 minutes, [appellant] told Chaplain [S] some, but not all, of the details concerning the acts____ [Appellant] made the decision to tell Chaplain [S] about the details of the acts, despite the fact that Chaplain [S] had told [appellant] that Chaplain [S] had an obligation to report to authorities.
Id. at ¶ j.
(5) Chaplain S informed appellant “that it would be best for him as a person” to confess and that Chaplain S would accompany him to the military police station for moral support. Appellant
was hesitant to go to the Military Police Station and confess, but after further discussion, he agreed that it would be better if he confessed right away. He and Chaplain [S] agreed that making a confession would be the best way for [appellant] to get the forgiveness of others and to help [appellant] forgive himself. Chaplain [S’s] prompting of [appellant] to confess was based upon his observation of [appellant] as a soul in torment.... Chaplain [S’s] actions and recommendations were based upon his desire as a chaplain to help [appellant] through his emotional and spiritual crisis.
Id. at ¶ k.
(6) Appellant
made the independent decision to go to the Military Police Station and make a formal confession to the Military Police because he thought it would be the best thing for him to do. One of the factors in his decision was that Chaplain [S] had told [him] *216 that Chaplain [S] had a duty to report the improper relationship.... [T]he primary reason for [appellant’s] decision to confess to the Military Police was that [appellant] believed it would help [him] with the torment that .he was going through. His decision to confess to the Military Police was not the result of [him] submitting to Chaplain [S] or Chaplain [S’s] position as a captain in the United States Army. [Appellant] knew at the time that Chaplain [S] was not ordering him to confess____ [T]he primary motivation for his decision to confess to the Military Police was not some fear that Chaplain [S] would report the matter.
Id. atHl.
(7) [B]y his course of conduct—deciding that he should confess to the Military Police, deciding to go to the MP station, deciding that he wanted Chaplain [S] to accompany him for moral support, and acquiescing to Chaplain [S] telling the MP Station Commander why they were there—[appellant] consented to Chaplain [S] divulging to the MP Station Commander matters which Chaplain [S] had learned of during a priest-penitent conversation.
Id. at ¶ n.
(8) Chaplain [S] went out front and sat with [appellant] for approximately 10 minutes____ [Appellant] was left in the MP station alone. [There was] no evidence that there was any physical or moral restraint placed upon [appellant] to remain at the MP station____ [Appellant] was free to leave the MP Station at any time during this wait____ [Appellant] waited at the MP Station for over an hour before the CID agents arrived____ [Appellant] voluntarily waited for the CID agents to arrive. ...
Id. at ¶ p.
(9) [The CID agent] was not aware of any of the specifics of the case____ He was only told by SFC King that there was a soldier who wanted to discuss a sexual assault of some kind.... [The CID agent] did not know at the time that [appellant] had made prior incriminating admissions to anyone. [Appellant] did not tell [the CID agent] that he had made prior incriminating admissions to anyone.
Id. at ¶ q.
(10) In filling out the rights advisement ..., [appellant] hesitated when he came to the right to counsel. He was obviously considering whether or not he wanted to have counsel.... However, [appellant] took his time, considered his right to counsel, and he then waived his right to counsel. [Appellant] was fully aware of his rights to counsel and against self-incrimination____ [T]he decision by [appellant] to waive his rights and submit to an interview with the CID was an informed and voluntary decision made of his own free will.
Id. at ¶ r.
(11) Appellant’s confession was “in his own handwriting” and was made “while he was left alone in the office.” Appellant “was aware of what he was doing, ... was not sleep-deprived” to any extent that would have affected adversely his mental processes, and the CID agents “in no way, shape, or form coerced or induced the confession.” Id. at ¶ s.
At trial, appellant’s wife testified during sentencing that she confronted her husband with the victim’s allegations shortly after returning from the hospital and appellant did not deny the child’s accusation. Appellant’s unsworn statement at sentencing revealed that he was 25 years old and had spent 7 years in the United States Army. In reading from a prepared statement, appellant said:
I failed as a father ... [Sobbing] ... and didn’t deny anything when confronted about what happened. I know I needed to get help in order to live my life correctly. My wife and I briefly talked about it and agreed that I would get help.
The day after the incident occurred, I sat down with Maria and started crying. I explained to her that what I did was wrong and not to let anyone do that to her again.
Since that day I’ve done all that I can do to make things right. I looked for help on my own. And when that failed, I went to *217 the chaplain for help. He convinced me that the best thing to do was to turn myself in, and the next day I did so.
I pled guilty here because ... excuse me ... I pled guilty here today because I was wrong. And it [sic] there was anything else I could do to show you how terrible I feel, I would do so.
DISCUSSION
Voluntariness of a confession is a question of law subject to our de novo review. Arizona v. Fulminante, 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Any special findings of fact are the basis for reviewing the question of voluntariness and are binding on this Court unless those findings are clearly erroneous. United States v. Ford, 51 MJ 445, 451 (1999).
In reviewing the totality of the circumstances, we do not presume that appellant’s confession to the chaplain tainted his later voluntary statement to the CID agents. See United States v. Norfleet, 36 MJ 129, 131 (CMA 1992). The presumption of taint arises after a confession is obtained due to “actual coercion, duress, or inducement.” Ford, 51 MJ at 450, quoting United States v. Phillips, 32 MJ 76, 79 (CMA 1991). Here, there was no actual coercion of appellant by Chaplain S. “There is a vast difference between the direct consequences flowing irom coercion of a confession by physical violence or other deliberate means calculated to break the suspect’s will and the uncertain consequences of disclosure of a ‘guilty secret’ freely given in response to an unwarned but non-coercive question.... ” Oregon v. Elstad, 470 U.S. 298, 312, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); see United States v. Murphy, 39 MJ 486, 488 (CMA 1994).
In Elstad, the Supreme Court addressed an issue similar to that at hand. There, the police officers who arrested Elstad in his home asked incriminating questions, and received incriminating responses thereto, without advising the suspect of his rights pursuant to Miranda. However, at the police station, Elstad was given a proper rights advisement, waived those rights, and gave a full admission of his criminal activity. The Supreme Court held:
We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.
470 U.S. at 314, 105 S.Ct. 1285; see United States v. Marquardt, 39 MJ 239 (CMA 1994).
The record shows that appellant was neither inexperienced nor immature. He was of reasonable intelligence. He voluntarily sought out Chaplain S on September 20 and without being questioned, confessed, in the hopes of reuniting his family (a process that started three months earlier when he asked Chaplain S for compassionate reassignment help). Appellant’s movement was not in any way restricted throughout this entire process. Specifically, if he had wanted to talk to an attorney after being advised on September 20 that the chaplain would have to report his sexual abuse to proper authorities, appellant could have done so. Instead, he returned to see the chaplain. His choice to bare1 his soul to the CID investigators after being warned of his rights was both rational and a voluntary exercise of appellant’s free will. It certainly was not coerced.
We know that neither the Fifth Amendment nor Article 31 are concerned with moral or psychological pressures to confess unless, of course, such pressure is applied through actual physical or official coercion. See Elstad, supra; Rhode Island v. Innis, 446 U.S. 291, 303, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); Oregon v. Mathiason, 429 U.S. 492, 495-96, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); Raymond, 38 MJ at 140; United States v. Fisher, 21 USCMA 223, 44 CMR 277 (1972). As the Supreme Court said in *218 Elstad: “This Court has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver.” 470 U.S. at 312, 105 S.Ct. 1285. Likewise, the Supreme Court “has never embraced the theory that a defendant’s ignorance of the full consequences of his decisions vitiates their voluntariness.” Id. at 316, 105 S.Ct. 1285; see California v. Beheler, 463 U.S. 1121, 1125-26 n. 3, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); McMann v. Richardson, 397 U.S. 759, 769, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). The Supreme Court has refused to find that a defendant who confesses after being falsely told that his co-defendant had turned against him does so involuntarily. See Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).
While appellant may have been under some stress because of his family’s return to Oklahoma as a result of his criminal misconduct, there is no support in the record for the proposition that he was so distraught or otherwise emotionally traumatized so as not to be able to exercise his free will.' The facts, as they exist in the record of trial and as found by the military judge, do not support the majority’s conclusion that appellant’s will was overborne so as to produce an unreliable, involuntary confession. The Government has clearly established that appellant exercised his free will when he chose to speak with the CID agents.
After accompanying appellant to the military police station, Chaplain S related to SFC K that appellant was present to make a statement about “an improper relationship with his stepdaughter that occurred while appellant’s wife was in the hospital and appellant had been drinking alcohol. Chaplain S did not provide any other details of appellant’s misconduct to SFC K.” 55 MJ at 623. How the interrogating officials from CID decided to warn appellant of his Article 31 rights for “indecent assault” is unclear, but there is no evidence that the interrogating officials used appellant’s confession to Chaplain S, who departed the military police station ten minutes after escorting appellant there and fifty minutes prior to the arrival of the CID representatives. Accordingly, it makes no difference whether Chaplain S was acting in his clerical capacity or as an Army officer-—no cleansing warning was required.
If there is an individual who was betrayed in this case, it is the innocent four-year-old child victim of sexual abuse, appellant’s stepdaughter. Appellant, ostensibly the nurturing stepfather, betrayed that role by sexually abusing his step-daughter while his wife was hospitalized. Now, because of the majority’s misapplication of the facts and law, an eight-year old will again have to relive the nightmare, as she, along with the others to whom appellant may have confessed, will be called back into court to testify during the rehearing which will surely be ordered.
For all of the above reasons, I respectfully dissent.

. The exclusionary rule does not apply to a violation of a general regulation. See, e.g., United States v. Caceres, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); United States v. Allen, 53 MJ 402 (2000).

. United States v. Seiber, 12 USCMA 520, 523, 31 CMR 106, 109 (1961)(the violation of a privilege has no applicability to extra-judicial occurrences); United States v. Squillacote, 221 F.3d 542, 559-61 (4th Cir.2000); State v. Sandini, 395 So.2d 1178 (Fla.App.1981); People v. Burnidge, 178 Ill.2d 429, 227 Ill.Dec. 331, 687 N.E.2d 813 (1997); Chase v. State, 120 Md.App. 141, 706 A.2d 613 (1998); see also United States v. Boffa, 513 F.Supp. 517 (D.Del.1981).