# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
HOLDEN, HOFFMAN, and SULLIVAN
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist THOMAS E. RUSSELL, JR.**
**United States Army, Appellant**

ARMY 20050281

United States Army Field Artillery Center and Fort Sill
Donna M. Wright, Military Judge
Lieutenant Colonel Lorianne M. Campanella, Acting Staff Judge Advocate
(recommendation)
Colonel Randall L. Keys, Staff Judge Advocate (addendum)

For Appellant:  Colonel John T. Phelps II, JA; Lieutenant Colonel Steven C. Henricks, JA; Major Billy B Ruhling, JA; Captain Ryan M. Suerth, JA (on brief).

For Appellee:  Captain Jaired D. Stallard, JA; Captain Magdalena A. Acevedo, JA; Major Tami L. Dillahunt, JA; Colonel John W. Miller II, JA (on brief).

29 April 2008

------------------------------------
OPINION OF THE COURT
------------------------------------

SULLIVAN, Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of two specifications of rape of a child under twelve years of age, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 [hereinafter UCMJ].  The convening authority approved the adjudged sentence to a dishonorable discharge, forfeiture of all pay and allowances, confinement for ten years, and reduction to Private E1.  This case is before the court for review pursuant to Article 66, UCMJ.

Appellant asserts the military judge erred by admitting statements made by the victim, MR, to a neighbor, YH, and to a psychologist, Doctor (Dr.) Robert Finkelstein.  First, appellant contends that MR's statements to YH were improperly admitted under Military Rule of Evidence [hereinafter Mil. R. Evid.] 807 and in violation of appellant's Sixth Amendment right to confrontation under *Crawford v. Washington*, 541 U.S. 36 (2004).  Second, appellant contends MR's statements to

Dr. Finkelstein were improperly admitted under Mil. R. Evid. 803(4) and the Confrontation Clause.

We find MR's statements to YH were nontestimonial under *Crawford* because there was no governmental involvement and no anticipation that such statements would be used at trial.[1] Furthermore, we find that the statements made to YH were properly admitted under Mil. R. Evid. 807.

In analyzing appellant's second assignment of error, we agree the military judge erroneously admitted MR's statements to Dr. Finkelstein under Mil R. Evid. 803(4). To assure the fullest protection of appellant's confrontation rights, we apply a constitutional standard for determining prejudice; nevertheless, we find the military judge's error harmless beyond a reasonable doubt and affirm the findings of guilty and the sentence.

## FACTS

### *Background*

Appellant, a thirty-two-year-old married operations clerk, pleaded not guilty to raping his five-year-old daughter, MR, in Lawton, Oklahoma, between December 2003 and April 2004, and at Fort Sill, Oklahoma, on 11 September 2004. The government's case consisted principally of two confessions made by appellant to criminal investigators, corroborated by two witnesses: YH, a neighbor in Fort Sill family housing, and Dr. Finkelstein, a psychologist who interviewed MR approximately two months after the allegations first surfaced.

---

[1] We note, without resolving, the possibility MR's physical presence and limited testimony at trial satisfied appellant's right to confrontation under the Sixth Amendment. *See United States v. Owens*, 484 U.S. 554, 561 (1988) ("Ordinarily, a witness is regarded as subject to cross-examination when she is placed on the stand, under oath, and responds willingly to questions." (quotation marks and citation omitted)); *see also United States v. Rhodes*, 61 M.J. 445, 450 (C.A.A.F. 2005) ("It seems counterintuitive that a witness who professes no memory of an event described in an earlier statement is available for confrontation purposes but unavailable for hearsay purposes. Yet that is the law . . . ."). At trial, the military judge made findings of fact and conclusions of law that MR "could not even testify on direct examination" and was not available "for purposes of the confrontation clause." These remarks, along with the cases cited by the military judge to support her findings (*United States v. Dorian*, 803 F.2d 1439 (8th 1986) and *United States v. Lyons*, 36 M.J. 183 (C.M.A. 1992)), indicate that the military judge made a finding that appellant's constitutional right to cross-examination was not satisfied through the limited testimony of MR. Since there is no absolute line as to what constitutes sufficient cross-examination for a child witness, we will not disturb the decision of the military judge.

YH, a military spouse, was the first to report appellant's rape of his young daughter. YH lived on post with her husband and three young children across the street from appellant and his family. Her six-year-old daughter, ZH, was a playmate of the victim. On 12 September 2004, the two girls, MR and ZH, were playing in ZH's bedroom. YH went to check on the girls because they had become quiet; she found the bedroom door locked and knocked several times, but the girls did not open the door. YH, who thought the girls were engaged in normal play, directed, "ZH, open this door or I'm going to spank you." At that point, ZH opened the door looking "like the cat that ate the canary." MR was standing on the other side of the bed with her shirt off. MR pointed at ZH and laughingly stated, "ZH wanted to play it; she liked it." YH, who was confused about what game the girls were playing, asked, "What's going on?" ZH didn't answer, but MR responded they were playing a "sex game."

YH immediately became concerned. She sent ZH from the room, had MR put her shirt back on, and took MR to the living room. Still smiling, YH told MR, "I want you to tell me about this game." MR said it took two people (a boy and a girl) who take off their clothes, lock the door, get on the bed, and go up and down. MR then demonstrated a pumping motion, laid on the floor on her stomach, and made her "midsection" go up and down. MR said her mom and dad do it and asked YH, "Don't you and your husband do it?" MR also said, "my daddy showed me and he hurt me in the middle."

YH proceeded to ask MR open-ended questions about the incident. YH testified she was aware that, if a question suggested an answer, children would "take it and run with it." YH asked MR to explain the "middle," and MR pointed to the center of the coffee table. When YH asked MR to point to her middle, MR pointed between her legs, at her vagina. MR said that it happened at "the other house, not where we live at now." YH asked how many times it happened; MR held up two fingers and said "two." Finally, YH asked where her mother was at those times and MR said that "she was outside raking the grass." YH had MR recount the incidents twice; on the third time, MR replied, "I already told you that." YH asked no further questions.

The conversation ended when MR asked for something to drink. YH, who was "rattled" by the disclosure, got the drink, took MR aside, and, in a comforting tone of voice, told her that "this is not a game for little girls to play." YH added, "if [MR] wanted to continue to play these games with ZH, she wouldn't be allowed to play" with ZH. MR's demeanor changed noticeably from "smiling, bubbly, and happy" to sad. YH asked no further questions and reported the conversation to Mrs. Russell, appellant's wife and MR's mother. Mrs. Russell informed YH that she told MR about sex when MR walked in on her parents being "intimate" when MR was three years old.

YH spoke with Mrs. Russell a few days later. Mrs. Russell stated she had talked to MR and decided "we were just going to take this and we were going to put

3

it in a little box and we're going to set it over here." Until then, YH had not intended to report MR's statements to any official agency because she did not want a girl as young as MR to be taken from her mother. At the time she had the conversation with MR, YH did not contemplate calling the Oklahoma Department of Human Services (DHS) or envision future court proceedings. YH's "heart went out to MR and I felt like I couldn't tell her mother fast enough." She assumed that Mrs. Russell "would take care of it." After concluding Mrs. Russell was not taking appropriate action in a timely manner, YH notified DHS officials. They took custody of MR.

On 17 September 2004, appellant was apprehended by the military police and transported to the Criminal Investigation Command (CID) office. Appellant was appropriately notified of the charges against him, advised of his right to counsel, and his rights against self-incrimination under Article 31, UCMJ. After a knowing and voluntary waiver of those rights, appellant was interviewed by several CID agents. Appellant provided an initial statement and the CID agents asked clarifying questions. Appellant completed a sworn statement indicating that, while his wife was absent, MR would climb on him while he was lying in bed. He recalled one incident at their home in Lawton in which he was lying naked in bed with an erect penis. MR, wearing a night gown, climbed on top of him, straddled him, and moved back and forth simulating sexual activities. Although appellant initially vacillated on the issue of penetration of MR's vagina, he eventually clarified there was slight penetration of about one-eighth of an inch. Appellant also confessed to a similar incident involving MR straddling him the week before, on 11 September 2004, while his wife was at work. On this second occasion, appellant stated MR began a rocking motion, which gave him an erection. Although MR was wearing underwear and he was wearing shorts, he admitted that their "private parts made contact" and eventually conceded "slight penetration" of about five-eighths of an inch. He denied assisting MR in the rocking motion.

A few days later, appellant voluntarily returned to the CID office to "clarify" his previous statement. A different investigative agent conducted this interview and, once again, appellant confessed to two "incidents" when his daughter climbed on top of him. In his second statement, appellant admitted that, while his daughter lay on top of him and his penis was on her vagina, he started moving her up and down in a rocking motion, at which time he believed his penis "may have put pressure on her vaginal opening and caused her to experience some pain at the time." He continued rocking until he eventually realized his actions were wrong and stopped. Appellant described the second incident in similar terms.

Over two months after YH's report, DHS requested Dr. Finkelstein, who possessed a doctorate in psychology and a master's degree in social work, to assess MR and make recommendations for treatment. Wearing casual civilian clothes, Dr. Finkelstein met MR only once in his office which he described as "homey." He did not introduce himself by name, although MR called him "Dr. Bob." Instead, he introduced himself by telling MR he understood she was in foster care and he was

4

there to try to help her with that: "I explained to her that I was going to try and help her with her foster care situation." He then placed MR in a play therapy area where she could relax, play, and have fun. MR was allowed to choose her play things.

Dr. Finkelstein testified that he did not "go into specifics of why I was there to help her." As he explained, his style is to use a relaxed atmosphere and he did not want to traumatize MR. He further stated that he never discussed with MR how he could help her with the alleged sexual abuse. Dr. Finkelstein testified he interrupted MR and asked her to use anatomically correct dolls "to demonstrate what happened to her that got her into foster care." MR picked one male and one female doll and, with Dr. Finkelstein's assistance, undressed them. She then put the male doll on top of the female doll, carefully aligning the respective genital areas. MR then stepped away from the dolls and said "It happened twice," "it hurt," and "her dad told her not to tell her mom but she told her mom." Afterward, Dr. Finkelstein thanked MR and let her go back to the play area.

### Trial Proceeding

At trial, the government moved to admit MR's statements under Mil. R. Evid. 807. The government noted they would attempt to produce MR at trial; however, they were unsure "[h]ow willing she is to talk about the allegations and the sex game." All parties agreed to reserve judgment on the admissibility of MR's statements to YH until MR testified.

The government first called MR as a witness. On direct examination, MR was able to testify that ZH's mom (YH) was nice, did not scare her, and that she told YH about the sex game. Even with prompting from the trial counsel and military judge, however, MR refused to respond to more specific questions about the incident. When specifically asked about the "sex game," MR began to cry and the military judge called a recess.

Approximately fifteen minutes later, the court-martial reconvened and MR was again called to testify. Almost immediately, MR stated, "I'm scared," and again refused to respond to specific questions about the incident or the "sex game." The trial counsel ceased questioning the witness and the defense counsel stated he had no "cross[-examination]" of the witness. Again, the military judge excused MR from the stand, but reserved judgment on the "unavailability" of MR. The military judge wanted to "hear from [MR] again" before making a determination of unavailability.

After the government called two other witnesses, MR was recalled to testify. Once again, MR refused to testify concerning the allegations of sexual abuse. Without objection from the defense counsel, the military judge then declared MR unavailable:

> [A]s a threshold matter, although [MR] did appear in
> court, I think for purposes of the confrontation clause, she

5

> is not available since she was not able to talk, really about any of the substance of the allegations. In terms of [YH]'s testimony, I think it is admissible as residual hearsay.

In her written ruling, the military judge restated and supplemented her rationale for declaring MR unavailable:

> Although she appeared in court, this is a situation much like one described in *United States v. Dorian*, where the five year old victim was "too young and too frightened to be subject to a thorough direct or cross-examination." 803 F.2d 1439, 1446 (8th Cir. 1986). Here [MR] could not even testify on direct examination. See also *United States v. Lyons*, 36 M.J. 183 (C.M.A. 1992) (17 year old mentally retarded victim testified at trial but her testimony was unintelligible).

During the defense case-in-chief, appellant testified the contact with his daughter was non-sexual: he was wearing shorts on both occasions and at no time was there penetration. Appellant claimed his first statement to CID was initially consistent with his testimony at trial but the investigating agents would not believe him. They "added" to his statement, which he signed only after becoming tired of "haggling." Regarding the discrepancies between his testimony and his second CID statement, appellant asserted the investigator would not let him tell his version and the investigator became angry. Appellant's wife also testified for the defense and declared MR denied the incidents happened.

The CID agents rebutted appellant's testimony, denying appellant was forced to sign his statement or that they denied appellant the right to amend either statement. With respect to penetration, appellant indicated during the second CID interview he did not think he penetrated quite as far as he'd admitted in his first statement. The CID agent explained that the test was "any penetration whether it was slight or whether it was full," to which appellant responded "okay" and never retracted his initial confession of penetration.

## LAW and DISCUSSION

### *Hearsay and the Confrontation Clause*

The Sixth Amendment to the United States Constitution provides, in part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause requires "the declarant to be physically present in the courtroom; physical presence allows the accused to confront the declarant in person, and cross-examine him in front of the trier of fact." *United States v. Williamson*, 65 M.J. 706, 715 (Army Ct. Crim. App. 2007) (quotation marks and citation omitted). The Confrontation

Clause's mandate is analogous to the evidentiary hearsay rules: "hearsay is defined as 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *United States v. McCaskey*, 30 M.J. 188, 190-91 (C.M.A. 1990) (quoting Mil. R. Evid. 801(c)); *see also* Federal Rule of Evidence 801(c).

The two concepts, constitutional confrontation and evidentiary hearsay, "are generally designed to protect similar values," *California v. Green,* 399 U.S. 149, 155 (1970), and "stem from the same roots." *Dutton v. Evans,* 400 U.S. 74, 86 (1970). However, "it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically. . . ." *Green*, 399 U.S. at 155. Although the "hearsay rules and the Confrontation Clause are generally designed to protect similar values," they do not completely "overlap." *Id*. Thus, a statement properly admitted under a hearsay exception may violate confrontational rights. *Id*. at 155-56 (citing *Barber v. Page*, 390 U.S. 719 (1968)). Similarly, a violation of the hearsay rules may not infringe upon the Sixth Amendment. *Id*. at 156. In a case such as this, a separate analysis of Confrontation Clause and evidentiary hearsay issues is necessary for resolution of the assigned errors.

Whether a statement constitutes testimonial hearsay is a legal question we review de novo. *United States v. Rankin*, 64 M.J. 348, 351 (C.A.A.F. 2007). In addition, this Court reviews evidentiary rulings on hearsay for an abuse of discretion. *United States v. Datz*, 61 M.J. 37, 42 (C.A.A.F. 2005). A military judge's findings of fact will be accepted "unless they are clearly erroneous or unsupported by the record." *United States v. Foerster*, 65 M.J. 120, 123 (C.A.A.F. 2007) (quotation marks and citation omitted).

### *MR's Statement to YH under the Confrontation Clause*

In *Crawford*, the Supreme Court addressed the intersection between hearsay exceptions and the Confrontation Clause, holding "testimonial" statements of witnesses not testifying at trial are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. at 59.[2] The Court drew a distinction between testimonial and nontestimonial hearsay:

> Where nontestimonial hearsay is at issue, it is wholly
> consistent with the Framers' design to afford the States
> flexibility in their development of hearsay law . . . .

---

[2] Prior to *Crawford*, the governing standard was *Ohio v. Roberts*, 448 U.S. 56 (1980), which held that out-of-court testimonial statements may be admitted as long as the witness is unavailable and the statements have "adequate indicia of reliability," i.e., fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness." *Id*. at 66.

> Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.

*Id*. at 68 (footnotes omitted).

In *Davis v.Washington*, 547 U.S. 813, 822 (2006), the Supreme Court had further opportunity to define what constitutes a testimonial statement:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

While *Davis* expounded the meaning of "testimonial," courts still struggled with the respective concepts of testimonial and nontestimonial, particularly when resolving issues involving child witnesses. *See Commonwealth v. DeOliveira*, 849 N.E.2d 218, 226 (Mass. 2006) (concluding that a reasonable person in a child witness's position would not have foreseen prosecutorial use of a statement to a doctor); *Wall v. State*, 184 S.W.3d 730, 742-43 (Tex. Crim. App. 2006) (the court looked towards an objectively reasonable declarant standing in the shoes of the actual declarant).

Our superior court has established three non-dispositive factors for analyzing whether a statement is testimonial:

> [A] number of questions emerge as relevant in distinguishing between testimonial and nontestimonial hearsay made under circumstances that would cause an objective witness to reasonably believe that the statement would be available for use at a later trial. First, was the statement at issue elicited by or made in response to law enforcement or prosecutorial inquiry? Second, did the "statement" involve more than a routine and objective cataloging of unambiguous factual matters? Finally, was the primary purpose for making, or eliciting, the

> statements the production of evidence with an eye toward trial?

*Rankin*, 64 M.J. at 352. "In undertaking this factors approach, our goal is an objective look at the totality of the circumstances surrounding the statement to determine if the statement was made or elicited to preserve past facts for a criminal trial." *United States v. Gardinier*, 65 M.J. 60, 65 (C.A.A.F. 2006).

Applying the factors identified in *Rankin* to appellant's case, it is evident the statement was not "elicited by or made in response to law enforcement." YH was a neighbor of MR with no recorded police or governmental involvement and, therefore, was not in any way an agent of law enforcement. According to her testimony at trial, YH had no intention of even reporting MR's statements other than to the child's mother. Her role was analogous to someone *in loco parentis*: MR was playing in her house with a similarly-aged child. When she heard silence, YH intervened to reassure herself the girls were safe and engaged in appropriate play. After MR's initial statement, YH further questioned the girl only to determine what MR meant by her statement about a "sex game." We are thus fully satisfied that YH was not engaged in an attempt to collect evidence for later use in a criminal proceeding.[3]

The third factor in *Rankin,* whether the "primary purpose for making, or eliciting, the statements is the production of evidence with an eye toward trial," also demonstrates the nontestimonial nature of the statement. It is in this factor that conflict and controversy continue to abound about who is the focus of the testimonial analysis.[4] We do not purport to resolve this issue, other than to note that regardless whether we focus on the state of mind of the declarant, the questioner, or an objective reasonable person, the result is the same: in this case, it is clear the statements were not testimonial. Neither the questioner, YH, nor declarant, MR, had any expectation the statements would be used for criminal prosecution, nor would any objective witness believe that such an expectation or intent would be reasonable in this "context." *Rankin*, 65 M.J. at 352. MR had no idea that her statements would likely be used in a criminal investigation or prosecution and "didn't appear or act in any manner that said she was doing anything wrong." Additionally, as previously noted, YH plainly did not think she was interrogating MR for the purposes of obtaining testimony to be used at a future criminal proceeding. *See*

---

[3] As to the second factor identified in *Rankin*, we find YH's conversation with MR to be more than "routine and objective cataloging of factual matters." 63 M.J. at 126. Unlike *Rankin*, however, this second factor has little import in the factual scenario presently before us. *Id.* (concerning admission of hearsay evidence admitted at trial under the business record exception).

[4] While not adopting a strict test, the Supreme Court noted that "it is in the final analysis the declarant's statements, not the interrogator's questions, that are decisive under the Confrontation Clause." *Davis*, 547 U.S. at 822 n.1.

*Gardinier*, 65 M.J. at 65 (considered the first and third factors identified in *Rankin* together for a child witness). Instead, the conversation between MR and YH was simply a concerned parent and neighbor questioning a young child to determine whether something inappropriate occurred.

As our superior court noted, "Statements made to family, friends, and acquaintances without an intention for use at trial have consistently been held not to be testimonial, even if highly incriminating to another." *United States v. Scheurer*, 62 M.J. 100, 105 (C.A.A.F. 2005) (quotation marks and citation omitted). Similarly, we find MR's statements to a neighbor, YH, were not made in response to any law enforcement or prosecutorial inquiry and the primary purpose was not to produce evidence with an "eye toward trial." Under these circumstances, no objective witness would reasonably believe MR's statements to YH were intended "to preserve past facts for a criminal trial." *Gardinier*, 65 M.J. at 352. Accordingly, we find MR's statements to YH nontestimonial.

### *MR's Statements to YH Under Mil. R. Evid. 807*

While YH's testimony did not violate appellant's Sixth Amendment right to confrontation, we must also analyze its admissibility under evidentiary hearsay rules. In general, an out-of-court statement made by someone other than the testifying declarant offered in evidence to prove the truth of the matter asserted is hearsay and is not admissible unless an exception applies. Mil. R. Evid. 801(d) and 802. The residual hearsay exception at Mil. R. Evid. 807 is one such exception. The rule states:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Mil R. Evid. 807.[5]

---

[5] Given MR's tender age, demeanor, the numerous unsuccessful efforts from the military judge to procure additional live testimony, as well as trial defense counsel's apparent acknowledgement of unavailability, we agree with the military judge's determination MR was unavailable under Mil. R. Evid. 804. *See United States v. Ferdinand*, 29 M.J. 164, 166 (C.M.A. 1989) (testimony admitted under Mil. R. Evid.

(continued . . .)

Since residual hearsay is not a "firmly rooted" hearsay exception, *Idaho v. Wright*, 497 U.S. 805 (1990), such hearsay must possess "particularized guarantees of trustworthiness" to be considered reliable and admissible. *United States v. Giambra*, 33 M.J. 331, 334 (C.M.A. 1991) (citing *Roberts*, 448 U.S. at 66). Our superior court has established certain non-dispositive factors to determine if there are sufficient circumstantial guarantees of trustworthiness. "These [factors] may include, among other things: '(1) the mental state of the declarant; (2) the spontaneity of the statement; (3) the use of suggestive questioning; and (4) whether the statement can be corroborated.'" *United States v. Donaldson*, 58 M.J. at 477, 488 (C.A.A.F. 2003) (quoting *United States v.Grant*, 42 M.J. 340, 343-44 (C.A.A.F. 1995)).[6]

Under the totality of the circumstances, we find MR's statements to YH carried particularized guarantees of trustworthiness. Foremost, MR's statements were spontaneous and unprompted. During her conversation with YH, MR was "laughing, bubbly, and happy" and MR's initial statements to YH "appeared not to be rehearsed, but to be speaking from memory." *United States v. Ureta*, 44 M.J. 290, 296 (C.A.A.F. 1996), *cert denied*, 519 U.S. 1059 (1997). Also suggestive of the trustworthiness of the statement is the manner in which YH conducted the interview. As YH testified, her initial inquiry into MR's statement about the "sex game" was non-suggestive and YH's follow-up questions were open-ended. Indeed, MR volunteered the information about appellant's acts.

Second, MR's terminology about the "sex game" in conjunction with her physical demonstrations was beyond the norm for a five-year-old child. Her statements and physical gestures paralleled each other: she both said her father did it "twice" and held up two fingers to show how many times; she used hand gestures to demonstrate the "up and down" motion, laid on the floor, and reenacted the motion; she pointed to the middle of the coffee table to show her understanding of "middle" and then pointed to her vagina as her "middle." *See Donaldson*, 58 M.J. at 488-89. Finally, there is no evidence of a motive to fabricate testimony; in describing the incident, MR displayed no awareness that her statements might implicate appellant in any wrongdoing.

---

(. . . continued)
807, the residual hearsay exception, may be admissible "provided the Government adequately demonstrates the declarant's unavailability as a witness" (quotation marks and citations omitted)); *United States v. Bridges*, 55 M.J. 60, 63 (C.A.A.F. 2001) ("the residual hearsay exception is not firmly rooted--thus, the requirement to establish unavailability and particularized guarantees of trustworthiness" (citations omitted)).

[6] The Supreme Court identified the following factors for determining trustworthiness in cases involving child witnesses: (1) spontaneity and consistent repetition of the statement; (2) mental state of the declarant; (3) use of terminology expected of a child witness; and (4) lack of motive to fabricate. *Wright*, 497 U.S. at 821.

We hold the military judge did not err in ruling MR's statements to YH admissible under Mil. R. Evid. 807: they were trustworthy, offered as evidence of a material fact (appellant's sexual acts upon his five-year-old daughter), were more probative on that point than any other reasonably available evidence, and the general purposes of the hearsay rules and interests of justice were best served by the admission of the evidence.

### *MR's Statements to Dr. Finkelstein under Mil. R. Evid. 803(4)*

Under Mil. R. Evid. 803(4), certain hearsay statements made to medical personnel are admissible even if the witness is otherwise available. *See United States v. Rodriguez-Rivera*, 63 M.J. 372, 381 (C.A.A.F. 2006) (hearsay testimony of child victim through a doctor was properly admitted at trial under Mil. R. Evid. 803(4) even though the interview was initiated by the trial counsel). Such statements include: "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause of external source thereof insofar as reasonably pertinent to diagnosis or treatment." Mil. R. Evid. 803(4); *see also United States v. Cucuzzella*, 66 M.J. 57, 62 (C.A.A.F. 2008) (statements made to a nurse and social worker were properly admitted under Mil. R. Evid 803(4)).

To qualify for this hearsay exception, two conditions must be met: "first, the statement must be made for purposes of medical diagnosis or treatment; and second, the patient must make the statement with some expectation of receiving medical benefit from the medical diagnosis or treatment that is being sought." *United States v. Williamson*, 26 M.J. 115, 118 (C.M.A. 1988) (quotation marks and citation omitted). "The rationale for Mil. R. Evid. 803(4) is the self-interested motivation to speak the truth to a treating physician or an individual in the mental health field in order to receive proper care and the necessity of the statement for a diagnosis or treatment." *United States v. Quigley*, 35 M.J. 345, 347 (C.M.A. 1992). "[A]n individual seeking relief from a medical problem has incentive to make accurate statements." *Manual for Courts-Martial, United States*, Analysis of the Rules for Courts-Martial app. 22, at A22-53 (2005 ed.).

Cases of child sexual abuse have presented particular challenges to our courts when analyzing the expectations of very young children. *Compare United States v. Dean,* 31 M.J. 196 (C.M.A. 1990), *cert denied*, 499 U.S. 906 (1991) (statements by six-year-old to medical center coordinator of child protective team and staff psychologist at county mental health center admissible), *and United States v. Edens*, 31 M.J. 267 (CM.A. 1990) (statements by three-year-old child to pediatrician admissible), *with United States v. Avila*, 27 M.J. 62 (C.M.A. 1988), *cert denied*, 493 U.S. 1002 (1989) (statement by four-year-old child to psychologist who introduced herself by first name and said "just another Mommy" not admissible). While our superior court has acknowledged there may be some relaxation of the required proof to establish admissibility where a child is being treated, the mere fact a child is

involved does not eliminate the need to meet both prongs. Indeed, "even when children are involved, 'the facts and circumstances must support a finding that both prongs of the test are met.'" *United States v. Faciane*, 40 M.J. 399, 403 (C.M.A. 1994) (quoting *Williamson*, 26 M.J. at 118).

In conducting an analysis of a child-victim's expectation when receiving medical treatment, courts can look beyond the testimony of the child and consider the testimony of the treating care provider and others who explained the purpose of the meeting with the provider. *United States v. Hollis*, 57 M.J. 74, 79-81 (C.A.A.F. 2002), *cert denied*, 537 U.S. 1039 (2002). As our superior court stated, "[W]hen a child is involved, 'it is often important for their caretakers to explain to them the importance of the treatment in terms that are understandable to the child.'" *United States v. Siroky*, 44 M.J. 394, 400 (C.A.A.F. 1996) (quoting *Avila*, 27 M.J. at 66). Indeed, "[t]he critical question is whether [the witness] had some expectation of treatment when she talked to the caregivers." *United States v. Haner*, 49 M.J. 72, 76 (C.A.A.F. 1998).

Considering the evidence presented during trial, there is little indication MR understood Dr. Finkelstein was a doctor or that the examination was for the purpose of receiving medical treatment. Foremost, no one from DHS or MR's foster care testified about what information MR was given prior to her meeting with Dr. Finkelstein. Dr. Finkelstein's only meeting with MR was at his "homey" office, in a play therapy area filled with toys selected at random by the child. He did not introduce himself as a doctor, was wearing casual civilian attire, and conducted no medical testing of any kind. Consequently, the sole evidence MR knew of any possible medical association was MR referring to Dr. Finkelstein as "Dr. Bob."

Second, while Dr. Finkelstein may have understood the purpose of the interview was for medical diagnosis, the relevant focus for the second prong is on MR's understanding. The evidence indicates MR had no expectation of receiving a medical benefit. Dr. Finkelstein never indicated to MR he was there to help her with a medical problem; instead, he told her he was there to help her with her foster care situation. When asked "[a]t some point did you discuss with her the allegations she had made about her father and how you could help her with those," Dr. Finkelstein stated flatly, "No." Over defense objection, the military judge allowed Dr. Finkelstein's testimony:

> I think even a 5-year-old, given the sequence of events in this case, would understand why she was in foster care. And one would presume that if she's taken out of the home, somebody is going to tell the child at least some reason of why she's in foster care. So, I think [Dr. Finkelstein's] explanation to [MR] that he's going to help her with the foster care situation establishes that [MR] knew why she was there. And I think the requirements of

13

> [Mil. R. Evid.] 803(4) have been met, under this circumstance.

Based upon the totality of the evidence in this case, we find the military judge's ruling on this issue to be "clearly erroneous." *Hollis*, 57 M.J. at 79. While MR may have understood Dr. Finkelstein could help with her foster care situation, Mil. R. Evid. 803(4) is not so expansive as to equate foster care with medical diagnosis or treatment. *Cf. United States v. O'Rourke*, 57 M.J. 636 (Army Ct. Crim. App. 2002), *pet. denied*, 59 M.J. 147 (C.A.A.F. 2003) (statements made to social worker admissible where social worker explained that social workers provide services closely akin to medical treatment).

### *Error Analysis*

Since the military judge abused her discretion by admitting MR's statements to Dr. Finkelstein into evidence in violation of Mil. R. Evid. 803(4), we must now determine whether appellant suffered any prejudice as a result of the inadmissible testimony. Considering the facts of this case, the continuing uncertainty regarding the application of *Ohio v. Roberts*, and to assure the fullest safeguard of appellant's confrontation rights in this case, we will apply a constitutional standard for determining prejudice.[7] *See United States v. Wilson*, 20 M.J. 31, 32 (C.M.A. 1985) (harmless beyond a reasonable doubt standard applied in abundance of caution).

With that constitutional standard in mind, we decide de novo whether the error was "harmless beyond a reasonable doubt." *United States v. Othuru*, 65 M.J. 375, 377 (C.A.A.F. 2007); *United States v. Simmons*, 59 M.J. 485, 489 (C.A.A.F. 2004) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). In so deciding, we consider all the circumstances of appellant's trial. *United States v. Hall,* 58 M.J. 90, 94 (C.A.A.F. 2003) (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986)).

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of

---

[7] Many jurisdictions no longer apply a constitutional standard to hearsay evidentiary rules. *See United States v. Arnold*, 486 F.3d 177 (6th Cir. 2007) (nontestimonial statements are only subject to the Federal Rules of Evidence); *Robinson v. Greene*, 507 F. Supp. 2d 279 (2d. Cir. 2007) (intimated, without ruling, that nontestimonial statements are not subject to the Sixth Amendment); *see e.g. United States v. Magyari*, 63 M.J. 123, 127 (C.A.A.F. 2006) (internal citations omitted) ("[W]hen the *Crawford* framework does not apply, the *Ohio v. Roberts* requirement for particularized guarantees of trustworthiness continues to govern confrontation analysis for nontestimonial statements.").

the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*United States v. Williams,* 40 M.J. 216, 218-19 (C.M.A. 1994) (citing *Van Arsdall,* 475 U.S. at 684).

Applying the factors set forth in *Van Arsdall* and excluding from our consideration the erroneously admitted testimony of Dr. Finkelstein, we find beyond a reasonable doubt that the military judge — or any reasonable trier of fact — would have concluded the appellant raped his daughter on two separate occasions. In addition, disregarding the improperly admitted evidence, we are convinced of appellant's guilt beyond a reasonable doubt. *See United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987). We find the importance of Dr. Finkelstein's testimony to be of little consequence. As noted by appellant's defense counsel during closing argument, MR never specifically told Dr. Finkelstein *appellant* did anything inappropriate. Instead, MR simply "lined up the genitals of the male and female dolls" Dr. Finkelstein provided. MR then stepped away from the dolls and said, "[i]t happened twice," "[i]t hurt," and "dad told [me] not to tell [my] mom." These statements provided little substantive information not already before the factfinder and, therefore, were merely cumulative of the other evidence already admitted.

Second, the quality of the improperly admitted evidence was *de minimis*. The interview between MR and Dr. Finkelstein occurred nearly two months after the allegation. MR did not provide an elaborate or detailed account. Instead, MR's statements were a limited response to direct questions from Dr. Finklestein rather than a more open-ended query. Consequently, the testimony provided by Dr. Finkelstein was less reliable than the other evidence produced at trial. *Cf. United States v. Cravens*, 56 M.J. 370, 376 (C.A.A.F. 2002)  (other evidence proximate in time to the offense was relevant to corroborate a confession).

Most significant here, the government presented a compelling case. Appellant was convicted of raping his daughter chiefly on the strength of his own statements to CID. In general, "[a] confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *United States v. Ellis*, 57 M.J. 375, 381 (C.A.A.F. 2002) (quoting *Arizona v. Fulminante*, 499 U.S. at 279, 296 (1991)); *see also Hopt v. Utah*, 110 U.S. 574, 584 (1884) ("[A] voluntary confession of guilt is among the most effectual proofs in the law, and constitutes the strongest evidence against the party making it that can be given of the facts stated in such confession."); *accord United States v. Monge*, 1 U.S.C.M.A. 95, 2 C.M.R. 1 (1952). In this case, after being fully advised of his constitutional and statutory rights, appellant voluntarily confessed he penetrated MR's vagina with his penis on two separate occasions. Appellant further confessed he knew his conduct was wrong on both occasions and he should not have engaged in these activities with his daughter. Those confessions were detailed and,

as acknowledged by both parties during closing argument, constituted the foundation of the government's case.

In addition, appellant's attempts at trial to explain away the two separate admissions were not plausible. Significantly, appellant confessed on two separate occasions to two different individuals, and on the second occasion he initiated the contact with CID. *See Fulminante* 499 U.S. at 299 ("it is clear the jury might have believed that the two confessions reinforced and corroborated each other"); *United States v. Murphy*, 50 M.J. 4, 11 (C.A.A.F. 1998) (holding, in part, "we are convinced beyond any reasonable doubt that appellant was not prejudiced by the unresolved conflict of interest because of the admission of his multiple confessions and the corroborating physical evidence"); *Turrentine v. Mullin*, 390 F.3d 1181 (10th Cir. 2004) (included multiple confessions by appellant in its determination of the "overwhelming evidence" against the accused); *United States v. Stapleton*, 288 F.3d 863, 868 (6th Cir. 2002) (a jury could have believed that multiple confessions "reinforced and corroborated each other" (quotation marks and citations omitted)). Consequently, appellant's incredible claim at trial that "I was just tired of fighting with them and I signed [the confession]" only served to highlight his guilt.

In addition to appellant's two confessions, MR's statements to YH provided independent, corroborative evidence of appellant's own confessions.[8] *See e.g. Opper v. United States*, 348 U.S. 84, 93, 99 (1954) (independent evidence is evidence not based on or derived from the accused's extrajudicial statements). In fact, in most respects, MR's statements to YH mirrored appellant's own admissions in each critical detail: MR spoke of two incidents, including one at her previous home, and appellant confessed to two incidents, one per house; MR demonstrated an up and down motion, and appellant confessed to the same; MR said it hurt her in "the middle," pointing to her vaginal area; appellant confessed that the pressure of his penis on her vaginal opening could have hurt her; MR said her mother was out of the house; appellant confessed his wife was not home; MR said the "game" was played with a boy and a girl wearing no clothes and on the bed; and appellant confessed he lay on the bed with MR, with both of them naked on the first occasion and, on the second occasion, he wore only thin silk-like shorts and she wore a nightgown and no underwear. Simply stated, YH's testimony alone was highly probative and provided sufficient corroborative evidence for appellant to convict himself. "In light of the record of trial in its entirety, we consider [] appellant to have been his own worst enemy" and find the evidence ruled inadmissible was harmless. *Williams,* 40 M.J. at 219.

---

[8] Mil. R. Evid. 304(g): "An admission or a confession of the accused may be considered as evidence against the accused on the question of guilt or innocence only if independent evidence, either direct or circumstantial, has been introduced that corroborates the essential facts admitted to justify sufficiently an inference of their truth."

16

On consideration of the entire record, including the assignments of error and matters personally asserted by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), the findings of guilty and the sentence are affirmed.

Senior Judge HOLDEN and Judge HOFFMAN concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court