# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
TOZZI, CAMPANELLA, and CELTNIEKS
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Sergeant First Class CHARLES BONILLA**
**United States Army, Appellant**

ARMY 20131084

Headquarters, 8th Theater Sustainment Command
Stefan R. Wolfe, Military Judge (arraignment and motions)
David L. Conn, Military Judge (trial)
Colonel Paul T. Salussolia, Staff Judge Advocate
Colonel Anthony T. Febbo, Staff Judge Advocate (post-trial)

For Appellant: Mr. William E. Cassara, Esquire (argued); Captain Amanda R. McNeil, JA; Mr. William E. Cassara, Esquire (on brief); Captain Cody Cheek, JA; Mr. William E. Cassara, Esquire (on supplemental brief).

For Appellee: Captain Scott L. Goble, JA (argued); Colonel Mark H. Sydenham, JA; Major John K. Choike, JA; Captain Scott L. Goble, JA (on brief); Lieutenant Colonel A.G. Courie III, JA; Major Melissa Dasgupta Smith, JA; Captain Vincent S. Scalfani, JA (on supplemental brief).

30 September 2016

-----------------------------------
MEMORANDUM OPINION
-----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

TOZZI, Senior Judge:

An enlisted panel sitting as a general court-martial convicted appellant, contrary to his pleas, of two specifications of rape of a child, one specification of aggravated sexual assault, one specification of carnal knowledge with a child under the age of twelve years, one specification of carnal knowledge with a child under the age of sixteen years, and one specification of sodomy of a child under the age of twelve years in violation of Articles 120 and 125, Uniform Code of Military Justice,

10 U.S.C. §§ 920, 925 (2000 & 2006) [hereinafter UCMJ].[1]  The panel sentenced appellant to a dishonorable discharge, confinement for thirty-five years, forfeiture of all pay and allowances, and reduction to the grade of E-1.  The convening authority approved only so much of the sentence as provided for a dishonorable discharge, confinement for thirty years, forfeiture of all pay and allowances, and reduction to the grade of E-1.

This case is before us for review under Article 66, UCMJ.  Appellate defense counsel assigns seven errors to this court, four of which warrant discussion, and one warrants relief.  The court specified one issue which merits discussion but no relief.

## BACKGROUND

Over a period of eight years, Ms. AM alleged that appellant, her step-father, repeatedly sexually abused her.  Ms. AM was eight to seventeen years old at the time of the abuse.  Appellant was charged and convicted based on Ms. AM's allegations.

On one occasion, in January 2004, appellant sexually assaulted Ms. AM in his bedroom and it caused her significant bleeding.  Ms. AM testified that "a chunk of skin was going out and I kept bleeding.  I remember crying in the bathroom.  I didn't know what was happening.  There was a lot of blood."  Three years later, Ms. AM told her mother and grandmother about the abuse.  Appellant was arrested and the Washington State authorities investigated the incident.  Ms. AM testified that while appellant was under investigation and a restraining order, he met with her and told her to recant or else her brother and mother would be living on the street.  Appellant also told her what to say to "recant."  Ms. AM subsequently recanted to police and the civilian charges against appellant were dropped.  Shortly thereafter, appellant continued to sexually abuse Ms. AM.

On Thursday, 22 March 2012, appellant raped Ms. AM again in his bedroom.  Ms. AM bled and she noticed a stain on the sheets.  Immediately after the incident, Ms. AM told her boyfriend, Private First Class (PFC) JU, and his sister's friend, TC, about the abuse.  They both encouraged her to report the incident and seek medical treatment.  Ms. AM immediately went to the hospital for medical treatment and a sexual assault forensic evidence (SAFE) kit was collected.  The United States Army Criminal Investigation Command (CID) began investigating the incident and a search of the house was conducted.  There were no visual signs of blood on the carpet or the sheets but appellant's bedding was found in the dryer.  Appellant's

---

[1] The panel acquitted appellant of two specifications of aggravated sexual assault of a child, one specification of aggravated sexual assault, one specification of sodomy with a child under the age of sixteen years, and one specification of forcible sodomy charged under Articles 120 and 125, UCMJ.  All of the offenses at trial involved the same victim, Ms. AM.

deoxyribonucleic acid (DNA) was also later found on Ms. AM's vaginal swabs. The DNA evidence obtained was a partial profile but PFC JU was excluded as a contributor.

At trial, appellant's wife, DB testified that she remembered a stain on the carpet and appellant told her it was "Kool-Aid." Ms. AM testified that DB, "caught [appellant] scrubbing the carpet" in the bedroom. DB also testified that the family typically did laundry on the weekend. A recognized expert in clinical and forensic psychiatry in the area of sexual abuse, child sexual abuse, and trauma testified that "children often recant" and recanting is most common when abuse occurs by a family member.

On the contrary, the defense theory of the case was that the abuse never happened. Appellant testified and denied any inappropriate touching of Ms. AM. According to appellant, Ms. AM was a troubled child and teen who was upset that her biological father remarried, had another child, and moved on. Ms. AM most likely made the allegations up so she could move back to New York City with her grandmother and be close to her biological father. Appellant was also the primary disciplinarian in the house. Additionally, the defense argued the DNA evidence was inconclusive because it was not a complete profile, and injuries to Ms. AM could have been self-inflicted.

## LAW AND DISCUSSION

### A. *Ineffective Assistance of Counsel*

At trial, appellant was represented by civilian defense counsel, Mr. TB and Mr. ET, and military defense counsel, Captain (CPT) JM. Appellate defense counsel assert appellant received ineffective assistance at trial when Mr. TB, Mr. ET and CPT JM failed to call a key defense witness during the merits case, Ms. SC, who would have testified about Ms. AM's character for untruthfulness. In support of this argument, appellate defense counsel offered the sworn affidavits of Ms. SC.

In November 2003, Ms. SC met and became friends with appellant and his family while stationed at Fort Lewis, Washington. Ms. AM was seven or eight years-old at this time. Ms. SC was a very close friend of the family. From May to September 2006, Ms. SC lived with appellant and his family and shared a room with Ms. AM  Although Ms. SC eventually moved out, she remained a close friend to appellant and his family until she lost touch with them when she moved to Georgia in January 2008. During the time Ms. SC kept in contact or was living with appellant and his family, the first incident of abuse of Ms. AM occurred. Ms. SC was aware of Ms. AM's report to authorities, she talked to Ms. AM about the allegations, and was also aware of Ms. AM's recantation of the incidents.

3

Upon order from this court, Mr. TB and Mr. ET[2] filed joint sworn affidavits. While refuting claims of ineffective assistance, Mr. TB and Mr. ET attest to Ms. SC's limited knowledge of Ms. AM's character for untruthfulness, requesting and ensuring Ms. SC was available to testify at trial, and their tactical considerations for ultimately not calling her at trial. Initially, the defense intended to call Ms. SC at trial but after interviewing her, they learned of "potential damaging testimony" that she could have given during cross-examination. The defense was "aware of a personal relationship between [appellant] and [Ms. SC], which could have been exploited by the government as bias." Additionally, the defense was concerned that her testimony would contradict appellant's testimony denying that he saw Ms. AM after her report and before Ms. AM's recantation. The defense weighed Ms. SC's "potentially beneficial testimony" against "the potentially harmful testimony she could have given" and made a tactical decision to not call her as a witness.

Appellate defense counsel submitted a second affidavit from Ms. SC responding to Mr. TB and Mr. ET's filed sworn affidavit. In her second affidavit, she provided additional details regarding her close relationship with appellant and his family and her knowledge of Ms. AM's recantation. Ms. SC stated, "[Ms. AM] admitted to lying about the rape because she wanted to go back to New York and live with her biological father. She admitted that she was jealous because her father had another baby with his girlfriend or wife at the time and [Ms. AM] felt left out." Directly addressing Mr. TB and Mr. ET's claim that appellant went back to her house to talk to Ms. AM after his arrest, Ms. SC attested that appellant did not come to her house until after April 2007, when the original charges regarding Ms. AM were dismissed. Additionally, she denied any "personal relationship" other than friendship between herself and appellant.

Upon order from this court, Mr. TB and Mr. ET filed a second joint affidavit, which further elaborated on their initial affidavit. They stated Ms. SC's testimony could have caused significant damage to the defense case because it could have corroborated the government's timeline for the sequence of events leading to Ms. AM's recantation, and contradicted appellant's testimony that he had no knowledge of Ms. AM's whereabouts after his arrest. In addition, Mr. TB and Mr. ET reiterated their belief that there was a personal relationship between appellant and Ms. SC, a potential bias, that "could have been apparent through either direct examination or cross-examination." Mr. TB and Mr. ET point to Ms. SC's affidavit wherein she states:

> As far as my opinion on [appellant], he is an amazing
> father, disciplinarian, trip planner, emotional supporter,
> husband, friend and even a God Father….Furthermore, not

---

[2] CPT JM was not involved in the tactical decisions of appellant's case so he did not file an affidavit.

> saying he would but if [appellant] wanted to 'cheat' on his wife he surely could and would do it with a grown mature adult woman not his own daughter.

Defense counsel went on to explain that Ms. SC's testimony could have opened the door to an audio recording of Ms. AM contradicting Ms. SC's assertion that Ms. A.M used questions she (Ms. SC) asked Ms. AM about the details of the sexual assaults in her statements to law enforcement personnel. Mr. TB and Mr. ET stated that as the trial unfolded they made a tactical decision to not call Ms. SC as a witness. They requested the presence of Ms. SC at trial to establish Ms. AM's motive to fabricate the allegations to move back to New York with her biological father, but were able to elicit this information from other witnesses on cross-examination, allowing them to argue this point in their closing argument. "Thus, there was no reason to risk the potential damaging testimony . . . to present cumulative evidence." They also were able to use Ms. SC's absence at trial to create reasonable doubt. Mr. TB and Mr. ET further stated Ms. SC's explanations varied throughout their interviews of her and "[she] gave [them] the impression that she wanted to be prompted on what to say to best help [appellant's case]."

The Sixth Amendment guarantees an accused the right to the effective assistance of counsel. *United States v. Gooch*, 69 M.J. 353, 361 (C.A.A.F. 2011) (citing *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001)). To establish that his counsel was ineffective, appellant must satisfy the two-part test, "both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "We review both prongs of the *Strickland* analysis de novo." *United States v. Mazza,* 67 M.J. 470, 474 (C.A.A.F. 2009) (citations omitted). The *Strickland* framework was adopted by the military justice system and further developed into a three-pronged test to determine whether an appellant has overcome the presumption of competence and shown prejudice:

> (1) Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions?";
>
> (2) If the allegations are true, did defense counsel's level of advocacy fall "measurably below the performance . . . [ordinarily expected] of fallible lawyers?"; and
>
> (3) If defense counsel was ineffective, is there a "reasonable probability that, absent the errors," there would have been a different result?

5

*Grigoruk*, 56 M.J. at 307 (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

"[D]efense counsel's decision on whether to call a witness is a tactical decision." *United States v. Akbar*, 74 M.J. 364, 390 (C.A.A.F. 2015) (citing *United States v. Anderson*, 55 M.J. 198, 202 (C.A.A.F. 2001); *United States v. Fluellen*, 40 M.J. 96, 98 (C.M.A. 1994). Our analysis of counsel's performance is highly deferential. *Strickland*, 466 U.S. at 689. We are not to assess counsel's actions through the distortion of hindsight; rather we are to consider counsel's actions in light of the circumstances of the trial and under the "strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). As a general matter we "'will not second guess the strategic or tactical decisions made at trial by defense counsel.'" *Anderson*, 55 M.J. at 202 (quoting *United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993)).

Ms. SC was not called as a witness in this case. Considering the affidavits filed by Ms. SC, Mr. TB, and Mr. ET, there is, however, a reasonable explanation for the decision not to call Ms. SC as a witness. After interviewing Ms. SC, with full knowledge of her potential testimony, the potential pitfalls therein, and the testimony elicited throughout the course of the trial, appellant's civilian defense counsel made a reasoned tactical decision not to call Ms. SC. Defense counsel also interviewed her in-person and were able to fully assess her credibility. Absent extraordinary circumstances, this is exactly the type of strategic, tactical decision, the relevant case law instructs us not to second guess. As such, we will not do so here. Based upon the entire record and the affidavits submitted by the parties we find there is a reasonable explanation for defense counsel's decision not to call Ms. SC.

Considering the affidavits filed by appellant conflict in some respects with the affidavits filed by Mr. TB and Mr. ET, we would ordinarily look to whether a post-trial evidentiary hearing is required as a threshold matter. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997). In this case, however, we are convinced that even assuming *arguendo* appellant's affidavits are truthful, and further assuming *arguendo* the testimony of Ms. SC could have been helpful to appellant, the tactical decisions made by defense counsel as articulated in their affidavits are not decisions that we would second guess. This is not a case where defense counsel failed to investigate a case, or failed to act as counsel. This is a case where defense counsel made a tactical decision not to call Ms. SC only after interviewing her in-person, weighing the relative merits of her testimony against its potential risks, and considering whether her testimony was necessary or cumulative in light of testimony

6

elicited from other witnesses. Appellant's assertion that his civilian defense counsel provided ineffective assistance lacks merit.

### B. *Prohibiting the Defense from Completing their Closing Argument*

On appeal, appellant alleges the military judge abused his discretion in prohibiting the defense from completing their closing argument and relies on Rule for Courts-Martial [hereinafter R.C.M.] 801(3) and *Herring v. New York*, 422 U.S. 853 (1975). We disagree and find that the military judge did not abuse his discretion.

After the parties discussed proposed instructions, the defense requested to bifurcate their closing argument so that Mr. ET would do the closing and Mr. TB would speak directly about the DNA and forensic evidence. Defense counsel asserted that, "There would be no overlap between the two of them." Government counsel objected to the bifurcation because it "violates the rules of the court as to tag teaming."[3] The military judge disagreed and decided it was a matter under his discretion. Defense counsel also argued that it would be for judicial economy purposes and stated, "[W]e . . . give our good faith assurance to the court that there will be no overlap, no tag teaming, or anything along those lines." The military judge decided to allow defense's proposed bifurcation, "As long as you, and I'm sure you will, stick to exactly as you indicated."

During the defense's closing argument, Mr. ET summarized the entire case and the defense's theory addressing issues of witness credibility and reasonable doubt. This portion of the closing argument encompassed thirty-nine pages of transcript. Mr. TB then gave his portion of the defense's closing on how the panel should interpret the forensic evidence. This portion of the argument encompassed fourteen pages of transcript. The following colloquy took place between Mr. TB and the military judge:

> CDC: Now, what the government tried to do, and which upset me, was try to get tricky and try to get creative with the DNA and do things which could have got their DNA examiner in a lot of trouble.
>
> ATC2: Objection, Your Honor.
>
> MJ: [Mr. TB], you are testifying and completely mischaracterizing the evidence.

---

[3] *See* Army Judiciary Rules of Court, Rule 17.5 (1 Nov. 2013): "Except with prior permission of the judge, only one counsel per side may examine any one witness or rise to address the court on any particular issue, motion, argument, or objection."

CDC:  I don't believe I am, sir.

MJ:  And, I've given a lot of forbearance.  But, you alleged prosecutorial misconduct, and you alleged professional misconduct by a witness.  You have no basis for that, so I want you to sit down.  Sit down.

CDC:  Sir, I've not alleged prosecutorial misconduct.

MJ:  You have certainly done that.

CDC:  I have not.

MJ:  You have,

CDC:  I believe the evidence shows, and I ask the question----

MJ:  You are done.  Sit down.

CDC:  Sir, I believe I have--should have the ability to properly defend the accused and go over the evidence.

MJ:  Yes, you have the ability to properly defend him.  But, you've abused----

CDC:  And, I'm not claiming on the record----

MJ:  You have abused your rights of argument in this court.

CDC:  Sir, I believe I have not, in any way, claimed prosecutorial misconduct.

MJ:  You certainly have.

CDC:  And, I'm not alleging that in any way, shape, or form, Your Honor.  I'm simply stating what the evidence has shown.  I've never stated that.  I'm not arguing that.

MJ:  You're done.

CDC:  And, I've made no claim on the record.

MJ:  You're done.  Sit down.

CDC:  I believe that----

MJ:  [Mr. TB], did you hear what I had said?  How many times do I need to repeat myself?

At that point, Mr. TB returned to his seat and the government was permitted to give its rebuttal argument.

The accused has a constitutional right to present argument through counsel before deliberation on findings.  *Herring*, 422 U.S. at 858; *see* R.C.M. 919(a).  Closing arguments by counsel "may include comment about the testimony, conduct, motives, interests, and biases of witnesses to the extent supported by the evidence."  R.C.M. 919 discussion.  However, the scope of such arguments are within limits, "Counsel should not express a personnel [sic] belief or opinion as to the truth or falsity of any testimony or evidence . . .  nor should counsel make arguments calculated to inflame passions or prejudice."  *Id.*

The accused's right to present a closing argument, however, is not absolute.  The military judge is required to "exercise reasonable control" over closing arguments.  R.C.M. 801(a)(3); *See* R.C.M. 919 discussion.  The military judge has the ability to "prescribe the manner and order in which the proceedings may take place . . . and the time limits for argument."  R.C.M. 801(a)(3) discussion; *see* R.C.M. 919 discussion.

> The military judge should prevent unnecessary waste of time and promote the ascertainment of truth, but must avoid undue interference with the parties' presentations or the appearance of partiality.  The parties are entitled to a reasonable opportunity to properly present and support their contentions on any relevant matter.

R.C.M. 801(a)(3) discussion.

The Supreme Court in *Herring v. New York* also acknowledged a judge's broad discretion to control the scope and duration of a closing argument:

> He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant.  He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial.

*Herring*, 422 U.S. at 862.

In the present case, the military judge permitted the defense counsel to bifurcate their closing argument over the government's objection, but reasonably limited the scope of Mr. TB's argument "to exactly as [he] indicated"– a strict discussion of the DNA and forensic evidence. Mr. TB discussed the DNA and forensic evidence to the panel but went one step too far when he asserted the trial counsel attempted to be "tricky" and "creative with the DNA . . . which could have got their DNA examiner in a lot of trouble."

Mr. TB's statement suggests that the trial counsel committed prosecutorial misconduct. Additionally, this statement is a mischaracterization of the evidence. Because Mr. TB's argument was "stray[ing] unduly from the mark," the military judge was within his authority under R.C.M. 801(a)(3) to intervene and stop his improper argument.

Although a more prudent approach would have been for the military judge to sustain the objection or stop the argument and conduct an Article 39(a), he had proper grounds and authority to terminate the argument at that point. Additionally under the totality of the circumstances, considering the leeway provided to defense counsel in bifurcating their closing argument and the robust and voluminous nature of the arguments presented, the military judge's actions did not create an appearance of partiality. Therefore, the military judge did not abuse his discretion.

### C. Hearsay

Appellant alleges the military judge erred by allowing the statement "He did it again" into evidence after he already ruled the statement was inadmissible. We agree this was error but find it harmless.

At the Article 39(a), the following colloquy occurred between the military judge and the trial counsel:

> MJ: . . . what is it that you anticipate that you are going to elicit?
>
> ATC1: She is going to say "He did it again," and [TC] can testify that she knew what that meant, because [Ms. AM] had told her previously.
>
> . . .

> MJ: . . . "He did it again," do you think that meets the criteria of a prior consistent statement?
>
> . . .
>
> ATC1: Well, we initially were trying to elicit the statement for [Ms. AM]'s state of mind--her then existing state of mind and the effect on the listener. So, when she said, "He did it again," the effect was to have----
>
> MJ: Right, but 803(3) specifically says that it may not include a statement, memory, or belief to prove a fact remembered or believed, right? So, that would not be an applicable state of mind exception, would it?
>
> [The first assistant trial counsel conferred with the trial counsel.]
>
> ATC1: Sir, the "He did it again," is off the table.

The prosecution recalled Ms. TC as a witness and in response to trial counsel's question about what Ms. AM said, Ms. TC stated: "'He did it again.' She was afraid that her mom wouldn't believe her and that she would end up in the streets with no place to go and no money, her little brother, and her mom." Defense counsel subsequently objected to her statement based on the military judge's Article 39(a) session ruling. The military judge overruled the objection and stated, "I think that was within the scope of the ruling."

"A military judge's decision to admit evidence is reviewed for abuse of discretion." *United States v. Hollis*, 57 M.J. 74, 79 (C.A.A.F. 2002) (citation omitted). A military judge's fact finding is reviewed under the clearly erroneous standard of review, while conclusions of law are reviewed de novo. *Id.*

Although the military judge discussed how "He did it again" was not admissible in the Article 39(a), he never specifically ruled on its admissibility because the trial counsel took it "off the table." It is also possible under the circumstances that the military judge's response "that it was within the scope of the ruling" was pertaining to the latter part of the witness' response. Nevertheless, it was error to admit "He did it again" into evidence because it does not fit within the existing state of mind exception. Military Rule of Evidence [hereinafter Mil. R. Evid.] 803(3) (The state of mind exception from the hearsay rule does not include "a statement of memory or belief to prove the fact remembered or believed . . . .").

11

When a military judge abuses his discretion in admitting evidence, this court must determine whether this error resulted in prejudice to appellant. To evaluate prejudice, we use a four part test in weighing "(1) the strength of the [government's] case; (2) the strength of the defense case; (3) the materiality of the evidence at issue; and (4) the quality of the evidence at issue." *United States v. Gunkle*, 55 M.J. 26, 30 (C.A.A.F. 2001) (citing *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)).

In regards to the first part of this test, the government's case was strong. Ms. AM's testimony, combined with DNA evidence and expert testimony explaining reasons for Ms. AM's recantation, supported the finding that appellant had sexual intercourse with Ms. AM. Additionally, there were several inconsistencies with appellant's version of the facts such as the "Kool-aid" stain and laundry incidents.

In contrast, when reviewing the second part of the test for prejudice, appellant's case was weak. The defense theory pursued at trial was that Ms. AM lied about the allegations-they never happened. The defense attempted to support these theories through cross-examination of Ms. AM, testimony of appellant, and through cross-examination of DB.

Finally, in regards to the materiality and quality of the evidence, the government's case did not rest on this statement and the panel already knew appellant was investigated for a prior incident of abuse involving Ms. AM and was charged in this case with the prior incident of abuse. The statement was merely cumulative to the other evidence presented at trial. We therefore conclude that the erroneous admission of Ms. TC's statement was harmless beyond a reasonable doubt.

### *D. Military Rule of Evidence 413 and 414 Instruction*[4]

At the close of evidence on findings, the military judge provided an instruction concerning the use of both charged and uncharged sexual misconduct involving Ms. AM pursuant to Mil. R. Evid. 413 and 414 as evidence of appellant's propensity to commit the offenses alleged in Charges II and III. *See* Dep't of Army, Pam. 27-9, Legal Services, Military Judges' Benchbook [hereinafter Benchbook], para. 7-13-1, n.3, 4 (1 Jan. 2010).

We review a military judge's decision to admit evidence under Mil. R. Evid. 413 for an abuse of discretion. *United States v. Solomon,* 72 M.J. 176, 179 (C.A.A.F. 2013). "Whether a panel was properly instructed is a question of law we review de novo." *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008) (citation omitted). Where an instructional error rises to a constitutional dimension, we review the error to determine if it was harmless beyond a reasonable doubt. *United*

---

[4] We specified this issue to the parties on 7 September 2016, following oral argument.

*States v. Kreutzer*, 61 M.J. 293, 298 (C.A.A.F. 2005) (citations omitted). "The inquiry for determining whether constitutional error is harmless beyond a reasonable doubt is whether, beyond a reasonable doubt, the error did not contribute to the defendant's conviction or sentence." *Id.* (citations and internal quotation marks omitted).

Here, the propensity instruction, while modeled on the *Benchbook*, was, in hindsight, improper in light of our superior court's decision in *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016). There, the court noted the use of charged misconduct and propensity evidence to prove other charged misconduct pursuant to Mil. R. Evid. 413 was improper. *Id.* at 356 ("It is antithetical to the presumption of innocence to suggest that conduct of which an accused is presumed innocent may be used to show a propensity to have committed other conduct of which he is presumed innocent.").

While we find the military judge's instruction created an error rising to a constitutional dimension, the similarity between *Hills* and this case ends with the propensity instruction. *Hills* involved two offenses against a single victim that occurred over the span of two hours on one night. The case relied heavily on the testimony of the victim who, at the time of assault, was heavily intoxicated and in and out of consciousness. DNA evidence in the case proved inconclusive. The present case is distinguishable on many fronts.

First, appellant raped, sodomized, and sexually assaulted Ms. AM on multiple occasions over a period of eight and one-half years.

Second, Ms. AM's memories of appellant's numerous assaults were clear and compelling, even though she at one point recanted allegations she made concerning the abuse. Ms. AM's testimony was supported by DNA evidence, Ms. AM's physical injuries, and a blood stain found on Ms. AM's bedroom floor. Additionally, expert testimony was provided to explain recantation is most common in children who are abused by a family member.

Third, the government's burden of proof beyond a reasonable doubt was reinforced extensively during voir dire, which alone spanned over 500 pages of transcript. At the outset, the military judge instructed the panel of the government's burden of proof. When then asked, the members indicated no disagreement with this rule of law. Throughout voir dire, the military judge and counsel asked multiple questions that reinforced that the burden of proof beyond a reasonable doubt rested with the government. In summary, the extensive voir dire clearly reinforced for the members that the burden of proof beyond a reasonable doubt rested with the government and never shifted to appellant.

Fourth, trial counsel did not reference propensity evidence in his argument.

Fifth, the panel did not appear to be confused by the military judge's instructions or as to the burden of proof.  When queried by the military judge, the members had no questions about the findings instructions.  Indeed, the members returned mixed findings showing they held the government to its burden of proof.

Viewing all of these factors, we are convinced beyond a reasonable doubt that the propensity instruction did not contribute to the findings of guilty or appellant's sentence, and any instructional error was harmless beyond a reasonable doubt.

*E. Unreasonable Multiplication of Charges*

Appellant asserts that the military judge erred in not dismissing Specifications 7 and 8 of Charge II based on unreasonable multiplication of charges.  The government concedes that these specifications are unreasonably multiplied.  We agree and accept the government's concession.

Appellant, was found guilty, *inter alia*, of the following violations of the UCMJ:

CHARGE II:  Article 120, UCMJ

SPECIFICATION 1:   In that [appellant], U.S. Army, did, at or near Fort Lewis, Washington, on divers occasions, from about 12 November 2003 to about 13 March 2007, rape [Ms. AM], a person who had not attained the age of 12 years.

SPECIFICATION 2:   In that [appellant], U.S. Army, did, at or near Fort Lewis, Washington, on divers occasions, from about 14 March 2007 to about 30 September 2007, rape [Ms. AM], a person who had not attained the age of 16 years.

SPECIFICATION 7:   In that [appellant], U.S. Army, did, at or near Fort Lewis, Washington, on divers occasions, from about 12 November 2003 to about 13 March 2007, commit the offense of carnal knowledge with [Ms. AM], a child under 12.

SPECIFICATION 8:   In that [appellant], U.S. Army, did, at or near Fort Lewis, Washington, on divers occasions, from about 14 March 2007 to about 30 September 2007, commit the offense of carnal knowledge with Ms. AM], a child under 16.

BONILLA—ARMY 20131084

Regarding unreasonable multiplication of charges, appellant was found guilty of rape and carnal knowledge with the same person, during the same time periods, and in the same locations. Specifically, the conduct alleged in Specification 1 of Charge II (rape of a child under twelve) is the same conduct alleged in Specification 7 of Charge II (carnal knowledge of a child under twelve), and the conduct alleged in Specification 2 of Charge II (rape of a child under sixteen) is the same conduct alleged in Specification 8 of Charge II (carnal knowledge of a child under sixteen). The military judge combined these specifications for sentencing purposes but appellant's convictions for all four specifications remained.

When a rape of a child offense alleges criminal conduct also charged as a carnal knowledge offense arising under the same incident of sexual intercourse, the offenses constitute an unreasonable multiplication of charges. *United States v. Hall*, ARMY 20000159, 2002 CCA LEXIS 392 (Army Ct. Crim. App. 28 May 2002) (summ. disp.); *see United States v. Quiroz*, 55 M.J. 334 (C.A.A.F. 2001). The government has requested this court to set aside and dismiss appellant's convictions of carnal knowledge of a child (Specification 7 and 8 of Charge II).

We agree that these specifications are unreasonably multiplied and will dismiss them in our decretal paragraph.

**CONCLUSION**

After consideration of the entire record of trial, the findings of guilty of Specification 7 and 8 of Charge II are set aside and DISMISSED. The remaining findings of guilty are AFFIRMED.

Reassessing the sentence on the basis of the errors noted, the entire record, and in accordance with the principles of *United States v. Winckelmann*, 73 M.J. 11, 15-16, we AFFIRM the sentence. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of his findings set aside by this decision, are ordered restored.

Senior Judge CAMPANELLA and Judge CELTNIEKS concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

15